Jerome **BYRNES**, Appellant,

v.

**UNITED STATES** of America, Appellee.

No. 18752.

United States Court of Appeals Ninth Circuit.

Feb. 7, 1964.

Rehearing Denied March 11, 1964.

---

Marcia King, Los Angeles, Cal., for appellant.

Francis C. Whelan, U. S. Atty., Thomas R. Sheridan, U. S. Atty., and Edward M. Medvene, Special Asst. to the U. S. Atty., Los Angeles, Cal., for appellee.

Before BARNES, HAMLEY and DUNIWAY, Circuit Judges.

BARNES, Circuit Judge.

Appellant, an investigator in the Alcohol Tobacco Tax Division, Treasury Department (hereinafter referred to as ATTD) was indicted on eight counts. Counts 1, 3, 5 and 7 charged him with violating 18 U.S.C. § 872 [1]—"attempted extortion"—allegedly occurring on four separate days, March 7, 8, 11 and 12, 1962. Counts 2, 4, 6 and 8 charged him with violating what was then 18 U.S.C.

---

[1] Section 872 of Title 18 U.S.C., reads in material part:

"Whoever, being an officer, or employee of the United States or any department or agency thereof * * * under color or pretense of office or employment * * * attempts an act of extortion, shall be fined not more than $5,000 or imprisoned not more than three years, or both * * *"

§ 202,[2] soliciting money by an officer and employee of the United States for the purpose of influencing his pending action, on the same dates.

Appellant was found guilty of Counts 1 through 5, and 7, and acquitted on Counts 6 and 8. Appellant was sentenced to eighteen months imprisonment on each count, the sentences to run concurrently.[3]

This verdict of guilty was arrived at on appellant's third trial. On the first trial, a verdict of guilty was returned on all eight counts, but thereafter a new trial was granted.[4] On the second trial, the jury disagreed and a mistrial was declared.

This is an appeal in forma pauperis. The factual background of this case is quite complicated, as are the trial proceedings. There are two volumes and 250 pages in the Clerk's Transcript, a Reporter's Transcript in 12 volumes and 2200 pages; plus a Second Supplemental Reporter's Transcript of 50 pages and a Third Supplemental Reporter's Transcript of 160 pages. Before us is a typewritten Opening Brief of 80 pages, with an Appendix of similar size; a 55 page Government Brief, and Appellant's Reply Brief of some 20 pages.

The appellant was released on bail during the time of his trials, and is on bail pending appeal. He was represented by appointed (though different) counsel at his trials. The record is replete with various motions made on his behalf.[5] Except as noted in note 5, supra, many if not most of defendant's various motions were granted, at least in part.

Jurisdiction below rested on 18 U.S.C. §§ 3231, 872, the previous 202 and the present 201. This court has jurisdiction pursuant to 28 U.S.C. §§ 1291 and 1294.

Twelve points are raised on this appeal. Appellant lists them as follows:

Point I. The evidence is not sufficient to sustain the verdict or judgment of guilty as to any count in the indictment.

2. Now incorporated in 18 U.S.C. § 201, 76 Stat. 1120. Section 202 of Title 18, U.S.C., then read in material part:

"Whoever, being an officer or employee of * * * the United States * * * asks, accepts, or receives any money, or any check, order, contract, promise, undertaking, obligation, gratuity, or security for the payment of money, or for the delivery or conveyance of anything of value, with intent to have his decision or action on any question, matter, cause, or proceeding which may at any time be pending, or which may by law be brought before him in his official capacity, or in his place of trust or profit, influenced thereby, shall be * * * imprisoned not more than three years * * *."

3. Appellant was sentenced to eighteen months as a maximum, subject to the provisions of 18 U.S.C. § 4208(a) (2), permitting earlier parole.

4. The trial judge made no explanation of grounds for his action, but simply granted the motion for new trial. (Clk's Tr., p. 229.)

5. Not including motions made during the trials, the following were made:

I—Before the first trial (June 26 to July 5, 1962):

(1) For a bill of particulars; (2) for inspection of government papers; (3) for discovery; (4) for assignment to a different judge; (5) for production of evidence produced before the Grand Jury; (6) to have the complaining witness examined by a psychiatrist; (7) to suppress evidence; (8) for right to subpoena witnesses; (9) to dismiss the indictment; (10) for additional subpoenas.

II—Before the second trial (October 10th to 27th, 1962):

(11) for judgment of acquittal and for new trial; (12) for return of seized property; (13) for suppression of evidence; (14) for dismissal; (15) to furnish stenographic transcript; (16) for subpoenas to be issued and served at government expense.

The government also filed a motion for continuance which was denied (Clk's Tr., p. 315).

III—Before the third trial (January 8th to 31st, 1963):

(17) for dismissal; (18) for subpoenas; (19) for transcript.

IV—Before the appeal:

(20) to exonerate bail; (21) for judgment of acquittal or new trial (denied); (22) to appeal in forma pauperis; (23) for a supplemental order allowing forma pauperis appeal.

The government also filed a motion for continuance which was granted (Clk's Tr., p. 425). Some of these motions were supported by supplemental affidavits and memoranda—as many as five in one instance.

Point II. The appellant was substantially prejudiced and deprived of a fair trial by the effect of the tainted and false testimony of the main defense witness, given under restraint, past intimidation, and fear of job reprisal.

Point III. The court erred in denying appellant's motion to dismiss the indictment based on the government's intimidation of defense witnesses.

Point IV. The court erred in denying appellant's motion for an order supressing certain evidence, and in denying appellant's motion to dismiss the indictment based upon violations of appellant's basic constitutional rights and denial of due process:

> The illegality of the arrest, search and seizure; the faulty complaint, illegal detention, and indictment based upon "illegal and tainted" evidence.

Point V. The court erred in not permitting appellant full latitude to develop and introduce oral evidence of defense witness Malcolm Warner.

Point VI. The court erroneously admitted into evidence on behalf of the prosecution "Appellant's gun, holster and cartridges" without proper foundation and without evidentiary support in the record.

Point VII. The court erroneously admitted into evidence on behalf of the prosecution the note (Ex. 37), "On floor behind front seat of my car" without proper foundation and without evidentiary support in the record.

Point VIII. The appellant was substantially prejudiced and deprived of a fair trial by the trial court granting the prosecution's motion for a continuance during the trial, and denying appellant's motion for a mistrial.

Point IX. The court erroneously admitted on behalf of the prosecution, a tape recording (Ex. 36) not properly authenticated, indistinguishable in crucial parts, and without any showing of the proper chain of custody of the evidence.

Point X. The court improvidently exercised its discretion in excluding vital impeaching evidence in the third trial that had been in evidence in the second trial.

Point XI. The appellant was substantially prejudiced and deprived of a fair trial by reason of government counsel's misconduct in constantly misrepresenting the state of the testimony.

Point XII. The appellant was substantially prejudiced and deprived of a fair trial by reason of government counsel's use of a bound volume of the transcript of testimony from the second trial.

I. *The evidence is not sufficient to sustain the verdict or judgment of guilty as to any count in the indictment.*

Appellant charges that "this record fails to fulfill the minimum legal requirement for conviction." He then states it is "impossible and unnecessary" to reproduce all the evidence in the case, and proceeds to call our attention "to the principles governing review of the evidence upon a claim of insufficiency to sustain a verdict of guilty which are applicable to *circumstantial evidence* cases." (Emphasis by appellant. Brief, p. 22.)[5a] But this is not a circumstantial evidence case. Much direct evidence was intro-

---

5a. Appellant urges us to accept his argument that in order to convict, inferences that may be drawn from circumstantial evidence must not only be consistent with a defendant's guilt, but inconsistent with every reasonable hypothesis of innocence (Opening Brief, pages 23–25), or, as it is sometimes phrased, "irreconcilable with any other rational conclusion." This is the old rule which the Supreme Court disapproved in Holland v.

United States, 1954, 348 U.S. 121, 139–140, 75 S.Ct. 127, 99 L.Ed. 150. Cf. Strangway v. United States, 9 Cir. 1963, 312 F.2d 283, 285, cert. den. 373 U.S. 903, 83 S.Ct. 1291, 10 L.Ed.2d 199; Bolen v. United States, 9 Cir. 1962, 303 F. 2d 870, 874; Cape v. United States, 9 Cir. 1960, 283 F.2d 430, 433; Remmer v. United States, 9 Cir. 1953, 205 F.2d 277, 287–288, reversed on other grounds, 347 U.S. 227, 74 S.Ct. 450, 98 L.Ed. 654;

duced.[6] It would be incorrect and in fact, impossible, for this court to consider this a case of *circumstantial evidence* alone. We are required, of course, in examining all evidence, whether direct or circumstantial, to draw all favorable permissible inferences to support the jury's verdict, and the judgment below. On appeal we are required, after a conviction, to consider the evidence in an aspect most favorable to the prosecution. Glasser v. United States, 1942, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680; Noto v. United States, 1961, 367 U.S. 290, 296–297, 81 S.Ct. 1517, 6 L.Ed.2d 836. And evidence to support one count, for which appellant was convicted will support an affirmance of all counts, in view of the concurrent sentences imposed. Sinclair v. United States, 1929, 279 U.S. 263, 299, 49 S.Ct. 268, 73 L.Ed. 692; Buford v. United States, 9 Cir. 1959, 272 F.2d 483, 486, n. 2. When so viewed there exists ample evidence to support the conviction.

II. *The appellant was substantially prejudiced and deprived of a fair trial by the effect of the tainted and false testimony of the main defense witness, given under restraint, past intimidation, and fear of job reprisal.*

■ This alleged error arises by reason of alleged discrepancies between the testimony of the witness Elroy Travis at the second and third trials.

*At trial number three*, Travis testified that the appellant had indicated to Travis that "he [Byrnes] had had a statement from Mr. Tallmadge, and * * * he felt Mr. Tallmadge was involved with other gun dealers in the East, and I can't recall any other conversation." (Appellant's Appendix, p. 74.)

On cross-examination, Travis testified he did not remember that appellant had represented that this statement contained any confession by Tallmadge that he had violated either the Federal Firearms Act or the National Firearms Act (separate Acts).

*At trial number two*, Travis testified under redirect examination that *he* "thought Mr. Byrnes had gotten a statement from Mr. Tallmadge which would *implicate* him in a violation" of one of the two Acts. (Emphasis added. Appellant's Appendix, p. 76.)

*At trial number one*, there is no record before us as to what Travis stated. Appellant's counsel states "upon appellant's best recollection and belief," that "the state of Travis' testimony" was the same at the first trial as at the second.

The testimony given at the second and third trials is not *necessarily* contradictory. The same questions were not asked of this witness at the two trials. At trial number two, Travis *thought* Byrnes had obtained a statement which would *implicate* Tallmadge in a violation of the Acts. This is not necessarily a confession Tallmadge had violated one of the Acts (though it might be). At trial number three, Travis testified that Byrnes told him he had obtained a statement from Tallmadge which *Byrnes thought* involved Tallmadge "with other gun dealers."

We cannot as readily as counsel for appellant does classify the second trial's testimony as "true testimony" (Brief, p. 28) and the third trial's testimony as

---

Stoppelli v. United States, 9 Cir. 1950, 183 F.2d 391, cert. den. 340 U.S. 864, 71 S.Ct. 88, 95 L.Ed. 631, reh. den. 340 U.S. 898, 71 S.Ct. 237, 95 L.Ed. 651. The current test is whether *"reasonable minds could find* that the evidence excludes every hypothesis but that of guilt."

6. For example: (1) the direct testimony of W. D. Tallmadge, from whom the jury found appellant attempted the extortion; (2) the testimony of W. G. Simon, Agent in Charge of the Los Angeles Office of the Federal Bureau of Investigation, as to the conversation he heard between Tallmadge and Byrnes when both were in the bathroom adjoining the former's office (R.T. 852 and 853); (3) the false statements made by Byrnes (later repudiated) to four witnesses respecting Tallmadge's telephone call to Byrnes on Sunday—a day Tallmadge was not within reach of a telephone because on a boat off Catalina; (4) the note (Ex. 37) admittedly printed by Byrnes and for which he had no immediate explanation, and later one that related to a gift for his children.

"false testimony" (Brief, p. 29). No reason is given for such characterization. We cannot say one, and not the other, is false. Nor in fact, that either is.

Nor can we ascribe to the prosecutor herein an intent "to knowingly cause false and misleading testimony to go into the record." Nor that he "by design used the testimony in his closing argument to full advantage." [7] (Brief, p. 29.)

We feel it much more likely that the differences between the testimony at the two trials, given in response to two differing questions (and whether those differences be small or substantial) establish at best a *discrepancy* never cleared up by subsequent questioning on either side. It surely falls far short of *proof* that one was *false*, or that a witness was *intimidated*, merely because it differed.

III. *The court erred in denying appellant's motion to dismiss the indictment based on the government's intimidation of defense witnesses.*

This "intimidation" charged is based on the original position taken by the ATTD that under Treasury Regulations it could not and would not permit its employees to talk about the case. This was modified to permit interviews with ATTD employees, but only if had in the presence of the United States Attorney, or Regional Counsel for the ATTD.[8] But such second position was modified and such restrictions were lifted *prior* to the second trial, and remained lifted thereafter.

There was no restriction by the ATTD or the United States Attorney in existence during the third trial. And it was at the third trial that appellant was convicted, and it is that conviction which is before us on appeal.

The record discloses that the trial judge spent much time on this problem, primarily because of the appellant's position that once the government employees had been advised of their employer's policy as set forth in the telegram (see note 8, supra), they would never talk freely to defendant or his counsel, even though the telegram were countermanded, so long as any representative of either the United States Attorney's office, or the office of a regional counsel for the Treasury Department, was present. Appellant had no objection to the prospective witnesses having their own private counsel present.

Appellant desired to question eight government employees as prospective witnesses—Messrs. Wilkins, Caughron, Robitaille, Gilmore, Warren, Monzon, Travis and Chrisman. He desired to question them on three specific matters:

(a) "The openness" with which Mr. Byrnes conducted his investigation of Tallmadge;

(b) The appearance of the place of business of Mr. Tallmadge on August 1, 1962;

(c) The weapons that were found at Mr. Tallmadge's place of business on August 1, 1962.

---

7. The government proescutor in his argument stated: *"But he* [Byrnes] *in no way indicated to Travis anything affirmatively that Tallmadge confessed to any particular crime."* (Emphasis appellant's.) This is an accurate reference to the record as it existed in the third trial.

8. The telegram on which the local supervisor in charge of the ATTD office relied was dated June 13, 1962, was from the Commissioner of Internal Revenue, and read as follows:
"RE: REQUEST OF ATTORNEY FOR JEROME BYRNES FOR PERMISSION TO INTERVIEW INVESTIGATORS. NO PERMISSION TO INTERVIEW SHOULD BE GIVEN BUT NO OBJECTION SHOULD BE RAISED. INVESTIGATORS SHOULD BE ADVISED THAT IF THEY CONSENT TO BE INTERVIEWED INTERVIEW SHOULD BE IN THE PRESENCE OF THE ASSISTANT U. S. ATTORNEY AND REGIONAL COUNSEL AND THAT NO CONFIDENTIAL INFORMATION SHOULD BE FURNISHED EXCEPT WITH RESPECT TO OPENNESS OF INVESTIGATION OF TALLMADGE BY BYRNES. INVESTIGATOR SHOULD BE GUIDED BY THE U. S. ATTORNEY AND REGIONAL COUNSEL AS TO SCOPE OF SUCH INFORMATION."

The trial judge required the eight prospective witnesses to appear before him at a pre-trial hearing on September 27, 1962. He advised them that in the three specific matters hereinbefore listed no one connected with any agency of the government had any objection to their speaking freely with the defendant,[9] and he encouraged them to talk.

Messrs. Gilmore, Monzon, Wilkins, Chrisman and Travis were willing to talk to the defendant, but desired Regional Counsel present, but *the defendant did not desire to speak to them under such conditions* and so stated. Mr. Caughron desired Regional Counsel present, but was willing to hire his own counsel, "if Mr. Byrnes insists." (Tr. p. 80.) Mr. Warner was willing to discuss the matters with defendant alone (Tr. p. 87). Mr. Robitaille was willing to discuss the matters with defendant "under any conditions he desires." (Tr. p. 82.)

We assume that the defendant spoke with those witnesses he desired to speak to prior to the third trial, under the conditions each prospective witness prescribed. It is significant that no claim was made by defendant prior to the third trial that any witness refused to speak to him or his attorney. Appellant actually called Warner, Travis, Robitaille, as well as one other employee of the ATTD, Albert W. Wilkins, as his own witnesses. Chrisman, Monzon and Gilmore were called as witnesses on behalf of the government.

Appellant urges that the majority of defense witnesses "were under government control" because once the order had been made not to discuss the case without government counsel present, the bell had been rung, and could not be unrung.

■■ It is true that any defendant has the right to attempt to interview any witnesses he desires. It is also true that any witness has the right to refuse to be interviewed, if he so desires (and is not under or subject to legal process). If a witness desires to have legal counsel present—either his own private counsel, or counsel supplied by someone else—(such as his employer) he has the right to dictate the terms and to have a *private* interview. Admittedly appellant has no federal authority on this point (Brief,

9. The court stated: "If you are under the impression you are under any restraint from either department [the U. S. Attorney's Office or Regional Counsel for the Commissioner of Internal Revenue], you can abandon that thought, because you are under no restraint so far as talking to Mr. Byrnes is concerned.

"You have the right to talk to him by yourself, if you want, which is perfectly proper, and you are not under any restraint about disclosing anything insofar as your department is concerned when you are taking about this field which I just mentioned.

"You, however, do have the right, if you want to exercise it, to have someone with you in discussing this matter with Mr. Byrnes. That is your right, that is your privilege. But you don't have to. There is no restraint upon you at all insofar as your division is concerned in talking to him about this particular matter.

"Now, is that clear to everybody?

"Have I stated this correctly now, Mr. Medvene, and Mr. Grieves?

"MR. MEDVENE: Yes, your Honor.

"MR. GRIEVES: Yes, your Honor.

"THE COURT: You all understand you can talk to Mr. Byrnes alone, if so desire, without any restraint at all, or any feeling that you are restrained by your department or anybody in the department. You can talk to him freely alone on the subject. You all understand that.

"Now, is there anybody that does not want to talk to Mr. Byrnes under those circumstances?

"Then all the witnesses now, except Mr. Caughron and Mr. Warner, I understand, will talk to Mr. Byrnes and his counsel.

"Now, we can arrange for that—you can talk to them in the jury room here if you want or you can arrange for it anyplace you like.

" * * *

"Now, you all understand this is not necessary that you have Mr. Grieves present, but there is no restraint or instructions to you by your department that Mr. Grieves or anyone else has to be present. This is entirely your own personal desire. Do you understand that? Do all of you understand that? If anybody doesn't, please speak up."

(There was no response.)

p. 38) supporting his position to the contrary. He does cite Bobo v. Commonwealth, 1948, 187 Va. 774, 48 S.E.2d 213, and urges this court to adopt its ruling to prevent what appellant describes as "unilateral discovery" by the government. But in the Bobo case the defendant was denied permission to interview another jail inhabitant who had been an earwitness to the murder with which Bobo had been charged, unless it were done in the presence of the prosecuting attorney—the attorney prosecuting the murder.

No such limitation was here placed on defendant's interviewing of witnesses by the government. Here there was no "prohibitory order of the court which refuses to grant him a private interview." Cf. Bobo v. Commonwealth, supra, 48 S.E.2d at 215. In fact, the record discloses the trial court endeavored in every reasonable way to assure all witnesses they could talk to the defendant privately and freely, *if they so desired*. At least two apparently did so confer with defendant.

■ The Bobo case has apparently never been followed.[10] We see no basis in the facts of this case to lay down a rule that a defendant's right to informally interview witnesses alone is greater than the witness's right to choose whether he will be (a) informally interviewed alone; (b) with some lawyer of his choosing present; or (c) not at all. We decline to adopt the Bobo rule for this court, because it is not applicable to the facts of this case.

IV. *The court erred in denying appellant's motion for an order suppressing certain evidence, and in denying appellant's motion to dismiss the indictment based upon violations of appellant's basic constitutional rights and denial of due process—the illegality of the arrest, search and seizure; the faulty complaint, illegal detention, and indictment based upon "illegal and tainted" evidence.*

Appellant urges six grounds in support of his motion to suppress: (a) that his arrest was illegal because without a warrant; (b) that the evidence was obtained as a result of an illegal search and seizure; (c) that the complaint filed with the United States Commissioner was defective; (d) that the setting of bail violated his constitutional rights; (e) that the continuance of the preliminary examination over his objections violated his constitutional rights; (f) that the indictment was obtained on "tainted" evidence.

■ IV (a) and (b). The first two points are answered by pointing out the arrest was made by F.B.I. agents; that 18 U.S.C. § 3052 gives such agents authority to "make arrests without warrant for any offense against the United States committed in their presence," *or* "if they have reasonable grounds to believe that the person to be arrested has committed or is committing such felony." At worst, therefore, this raises the question of "probable cause." Cf. Carroll v. United States, 1925, 267 U.S. 132, 162, 45 S.Ct. 280, 69 L.Ed. 543. A careful reading of the testimony of Agent William G. Simon (and particularly Tr. pages 851 to 853), after his conference with the witness Tallmadge, discloses ample probable cause for appellant's arrest, and this irrespective of whether the United States Attorney previously thought there was or was not probable cause for the appellant's arrest on the preceding Saturday (when he expressed the opinion there was). Appellant was arrested, not by reason of what the United States Attorney thought, but because of what Agent Simon saw and heard.

Appellant complains that the United States Attorney's information which to him constituted probable cause was based "on the unsubstantiated word of W. D. Tallmadge." Because of Tallmadge's character and criminal record, appellant urges us to rule his statements must be totally disregarded. Such, however, is not the law. No cases need be cited to

10. It appears in Shepard's Citations but once, where it is not followed. Cf. Winston v. Commonwealth, 1948, 188 Va. 386, 49 S.E.2d 611, at 613.

prove it. And the search of appellant's person and car was incidental to the lawful arrest.

 IV (c). The complaint filed for appellant's arraignment charged him with soliciting a bribe on or about March 8, 1962. The complaint need only charge the crime, and need not show probable cause, on its face, to give jurisdiction to the United States Commissioner. This is not like an affidavit for a warrant of arrest. That must show probable cause. Giordenello v. United States, 1958, 357 U.S. 480, 78 S.Ct. 1245, 2 L.Ed.2d 1503. Upon arraignment, if there has been no indictment, the Commissioner must by preliminary examination (unless it is waived) *satisfy himself* there is probable cause to believe that a crime has been committed and the person arrested has committed the crime. Fed.R.Crim.P. 5 (c). But the face of the complaint gives him jurisdiction if it follows the statutory language and if it relates the essential facts constituting the offense charged. United States v. Walker, 2 Cir. 1952, 197 F.2d 287, cert. den. 344 U.S. 877, 73 S.Ct. 172, 97 L.Ed. 679. Rules 3 and 5, Fed.R.Crim.P. The complaint was not defective.

IV (d). This is not worthy of comment. We find no error.

 IV (e). As to the continuance of the preliminary examination, the first request for a continuance was on March 30, 1962. It was made by the government and appellant acquiesced. On April 20, 1962, the government requested and obtained a week's continuance over appellant's objection. This was because the Grand Jury was expected to indict. The indictment came down on April 25, 1962. This eliminated any need for the preliminary hearing. Boone v. United States, 6 Cir. 1960, 280 F.2d 911. (Brief, p. 56.) But urges appellant, the government never intended to have a preliminary hearing, and the only reason for the continuance was the government's convenience. This is pure conjecture. It may be true. But appellant has shown no prejudice. He was not confined, but was out on bail fixed in the sum of $5,000 —reasonable in view of the charge.

 The court below has held there was no unnecessary delay in presenting the matter to the Grand Jury, or in bringing the appellant to trial. Rule 48(b). We cannot hold such decision clearly erroneous.

IV (f). We have discussed the evidence, allegedly tainted, elsewhere.

V. *The court erred in not permitting appellant full latitude to develop and introduce oral evidence of defense witness Malcolm Warner.*

We have read the portion of Malcolm Warner's testimony to which we were directed in Appellant's Appendix, as well as all testimony he gave at the trial. There he was asked:

"BY MRS. KING:

"Q. Mr. Warner, did you review this work file after it was taken out of Mr. Byrne's desk?

"A. No, I did not.

"Q. From the documents that you saw in the work file, was there enough, in your opinion, to have constituted a case against Mr. Tallmadge, which was enough to take to the U. S. Attorney's Office?

"MR. MEDVENE: Objection, your Honor. It calls for speculation and conclusion. It has nothing to do with the issues in the case, as to whether or not there was an attempted shakedown.

"THE COURT: He said he didn't examine the work file, as I understand it.

"MRS. KING: He said he didn't review it. He did say he did see all these documents.

"THE COURT: Can you answer that question, Mr. Warner? Did you examine the file? Did you review it sufficiently that you have an opinion in this regard?

"THE WITNESS: Not at that time, no, sir.

"THE COURT: All right."

And again the witness was asked:

"Q. After the file was taken out of the drawer of Mr. Byrnes' desk and after his arrest, did you at any time review that file?

"A. Yes, I did.

"Q. In your opinion, after reviewing it, was there enough to take it to the U. S. Attorney's office in a case against Tallmadge?

"MR. MEDVENE: Objection as to relevance; [etc.]."

Warner was the Assistant Supervisor of the ATTD; and appellant was under his immediate supervision. Other than proof of those two facts, no attempt was made to qualify him as an expert witness, or one capable of giving any opinion on any subject. There was no showing it was part of his job to review files to determine if they were "enough to take to the U. S. Attorney's office." There was no testimony he had ever made such a decision himself (although he undoubtedly had). There was no testimony of any standards that were commonly acceptable (i. e., as to what was "enough") either in this particular ATTD office, or any other, or in the profession generally. There was no proof anything had been added to, or taken from, the file, or that such action had not been taken, or that nothing had happened to the file. There was no offer of proof on any of these subjects mentioned. There was no attempt to establish any such foundation for the presentation of opinion testimony by an alleged expert.

■ Both questions asked were objectionable as calling for the conclusion of the witness, and for his opinion. Appellant states that such questions were permitted in the first and second trials, although no reference is made to chapter and verse; nor to what objections, if any, were urged at those trials. Here objection was made, and it was timely. We cannot hold the sustaining of the objections to such questions was error at this trial, no matter what occurred at the other trials.

VI. *The court erroneously admitted into evidence on behalf of the prosecution "Appellant's gun, holster and cartridges" (Ex. 41) without proper foundation and without evidentiary support in the record.*

■ The only objection made to the introduction of the appellant's "gun, holster and cartridges," was "immateriality." This was not a strong objection, but was probably a valid one, in view of the fact the evidence was not mentioned again during the trial; was not mentioned in argument; and (by stipulation) was not taken to the jury room. It may have had some slight weight in showing appellant, in carrying the objects, was on official business at the time of his arrest. Error, if any was committed in admitting it, was not prejudicial to the appellant, and was harmless.

VII. *The court erroneously admitted into evidence on behalf of the prosecution the note, "on floor behind front seat of my car" without proper foundation and without evidentiary support in the record.*

and

IX. *The court erroneously admitted on behalf of the prosecution, a tape recording (Ex. 36) not properly authenticated, indistinguishable in crucial parts, and without any showing of the proper chain of custody of the evidence.*

■ ■ Points VII and IX, relating to the admission of Exhibits 36 and 37, are barely worthy of mention. Exhibit 37 was a note found on the car seat, printed by appellant. There was no objection save as to its materiality. It had been referred to in previous testimony; it was the best evidence; and it was material. Exhibit 36 was a tape recording. If anything, it was, because largely unintelligible, of help to the appellant. But the prosecution, having heard reference to it in testimony of other witnesses, had the right, if not the duty to produce it.

No cases are cited to prove its introduction was error, and we find none. Because a bit of evidence is so poorly prepared as to be "unintelligible," or "indistinguishable" may persuade counsel proposing to use it not to do so; but such facts alone do not make it inadmissible if it has, in the opinion of the trial court, any probative value whatsoever. And in determining whether it does have such evidentiary value, even though slight or doubtful, the wise trial judge exercises a liberal discretion.

VIII. *The appellant was substantially prejudiced and deprived of a fair trial by the trial court granting the prosecution's motion for a continuance during the trial, and denying appellant's motion for a mistrial.*

The third trial started Tuesday, January 8, 1963. In accordance with the custom of the courts in the Southern District of California, all trials normally recess each week from Friday evening to Tuesday morning, there being no Monday sessions. Thus on January 15th, 1963, when the motion for continuance was made by the government, two full days of testimony had been given, plus one and one-half hours on January 8th (after the jury had been chosen) and one-half day on January 10th, 1962.

Most of this time was given to direct and cross-examination of the witness W. David Tallmadge, although some seven other witnesses had testified for the plaintiff. Appellant urges us (a) that the "prime aspect" of the appellant's defense was reliance on the cross-examination of this witness, (b) that he was "thoroughly and completely impeached," (c) that the "10 day continuance" could only have served to dim the memories of the jurors as to Tallmadge's testimony. But appellant does not stop with the last statement. His counsel flatly states: "They [the jury] could not have retained the memory of Tallmadge's testimony for that long a time." (Brief, p. 64.)

We note: (1) the continuance requested on January 15, 1963, was actually for four trial days, although the interval was seven days; (2) after such continuance, the government spent one and one-half days further in putting on its case, and appellant spent two full days and two half days—the last half being *after* the weekend of January 25th to January 29th, 1963. The argument lasted a full day—the jury was instructed the next. There thus were involved twelve trial days and under the peculiar system prevailing in the district, the trial under any circumstances was required to last a minimum of three calender weeks—from January 8th to January 25th. Instead it ran to the 31st. Thus it seems clear to this court that the problem of what the jury might remember and what it might forget exists in this case just as it does in any long case; perhaps accentuated slightly by the habit of the judges regularly sitting in this particular district to recess over a long weekend so that they may deal with other litigation on Mondays.

Passing as pure conjecture our first surmise that any delay in the middle of the prosecution's case would be more of an aid than a harm to the defendant,[11] we must state that while we may accept the validity of (a), supra, (under this heading, VIII), we cannot agree with either (b) or (c), as urged by appellant.

But whether we can or cannot so agree is beside the point. The continuance was requested by the government for a good and valid reason—the sudden critical illness of the father of the government's special counsel—Mr. Medvene. This illness was sudden and unanticipated in its occurrence, and once occurred, was anticipated to be terminal in character. It occurred in Philadelphia. Mr. Medvene's father's heart had actually stopped, and manual massage was necessary to restart the heart. Mr. Medvene had gone East, and was not present in court to request the continuance.

---

11. A conjecture in which we were joined by the trial judge (Tr. p. 909).

Three days of testimony and four of trial had been completed. Under the circumstances there existing, the court had the practical choice (1) of denying any continuance, and granting a mistrial; (2) of granting a short continuance (of two or three days), to permit some other government attorney to familiarize himself with the case; [12] (3) of putting the matter over one week (four court days) and notifying the government it *must* be ready to proceed on the 22nd of January, under any and all circumstances.

The trial judge chose the latter course as the better under all the facts before him. We not only can find no abuse of the wide legal discretion each trial judge has under such circumstances; we concur in what we describe as his good judgment. His emphasis on the necessity for starting without fail on the January 22nd, 1963, date was forceful. His sympathetic attitude toward each side showed his neutrality, with a proper concern for the court's welfare. His conference with counsel with respect to instructions to be given the jury in this limited area showed a competent understanding of the problem.

Appellant cites no case to us holding a continuance, under the circumstances here existing, was error. We find none existed.

X. *The court improvidently exercised its discretion in excluding vital impeaching evidence in the third trial that had been in evidence in the second trial.*

This point is improperly presented on this appeal. Rule 18(d) is not followed.[13]

We have, however, examined the transcript carefully with respect to Exhibits A and B, allegedly introduced in previous trials and not in this; and particularly the pages referred to by appellant (pages 397 to 414, inclusive). The trial judge repeatedly stated anything in the document that *impeached* the witness Tallmadge could be read into evidence, but that the libel filed by the government against the witness in Wisconsin did not impeach him. (The fact the libel was filed was freely admitted.)

When requested by the trial court to point out to it "where you say it impeaches him, Mrs. King," appellant's counsel stated: "I am not going to talk about impeachment right at this moment." When the trial court persuaded government counsel to stipulate that Mr. Tallmadge manufactured some thirty-nine guns between March 1st, 1957 and May 3, 1958, but *not* that the manufacturing was improper, Mrs. King refused (Tr. p. 411). The court then permitted the reading to the jury of a portion of the stipulation signed by the witness (Ex. B—"The portion appearing in quotations on the 1st and 2nd pages" (Tr. p. 412)).

Appellant's counsel then asked a question preliminary to impeachment (Tr. p. 423). The government objected that "the proper [impeaching] question" had not been asked. The court ruled it had been (Tr. p. 423). Appellant's counsel then asked the witness to read the alleged impeaching portion, and then read it to the courtroom and jury (Tr. pp. 427–428).

The court then stopped the reading when the impeaching date had been es-

12. (a) Mr. Medvene, representing the government had been retained specially to try this case, having left government employment at least one month before the trial started (Tr. p. 905). (b) Apparently no other government attorney was familiar with the case. Counsel for the defendant could only suggest that Mr. Kerley, an F.B.I. agent, be entrusted with the prosecution. The record does not show if Mr. Kerley was an attorney. He may well have been, but we can as-

sume he was not in active practice (Tr. p. 904).

13. See particularly Appellant's Brief, note 16 (p. 70). Rule 18(d): "When the error alleged is to the admission or rejection of evidence the specification shall quote the grounds urged at the trial for the objection and the full substance of the evidence admitted or rejected, and refer to the page number in the printed or typewritten transcript where the same may be found."

tablished. The entire proceedings after objections were overruled, is as follows:

"MRS. KING: May I read it, your Honor?

"THE COURT: Yes.

"MRS. KING: This document is dated March 1, 1960, and the portion to which we have just referred reads as follows:

"'During the period from on or about March 1 thirty-nine machine guns were made by W. David Tallmadge, Summit, Wisconsin, and the records required to be kept with respect thereto by Title 26, ——'

"THE COURT: Your question now concerns the date of the acquiring.

"MRS. KING: That is right.

"THE COURT: That is the portion you have read.

"MRS. KING: Yes. Do you want me to stop now, your Honor?

"THE COURT: Yes.

"MRS. KING: All right.

"THE COURT: Unless you may have use for it later, but insofar as this particular point is concerned you have covered it. Isn't that right?

"MRS. KING: Yes, your Honor.

"THE COURT: All right.

"Q. BY MRS. KING: Now, of the 42 machine guns that were picked up at that time by the Government, Mr. Tallmadge, had any of them been reactivated?

"A. I believe so.

"Q. And who reactivated them?

"A. I did.

"Q. About how many of them were reactivated?

"A. Well, I would say every one was in a different state—or most of them were in different stages of manufacture.

"Q. Isn't it a fact that one of those guns was the same model Lewis gun which has here been put in evidence by the Government as Government's Exhibit No. 1?

"A. I believe that one of them is very similar, that is correct.

"Q. Isn't it a fact that it was the same model?

"A. I can't say for certain, but I believe so."

Thereafter counsel for appellant *made no further effort* to impeach by the use of these documents. No impeaching questions were asked. No offer of proof was made or tendered. Thus appellant's counsel is inaccurate in stating the court *only* permitted in evidence the one portion she read to the jury. We cannot know what else might have been admitted in evidence, if the proper foundation, *or any attempt to lay a proper foundation* for impeachment, had been made.

 No cases are cited in behalf of appellant's Point X, and we can find no error in the careful and considerate manner in which the trial court treated appellant and his counsel in respect to this matter of impeachment.

XI. *The appellant was substantially prejudiced and deprived of a fair trial by reason of government counsel's misconduct in constantly misrepresenting the state of the testimony.*

Appellant charges government counsel with misconduct:

1. in attempts to bolster Tallmadge (Point X, supra);

2. in "intimidating witnesses" (Point III, supra);

3. in stating: "Simon stated he heard Tallmadge state $25,000 is a lot of money" in a brief filed in the government's opposition to a motion for acquittal or new trial (Clerk's Tr., p. 487, lines 24–28);

4. in stating in opening argument on behalf of plaintiff:

(a) "MR. MEDVENE: * * * We will delve into it later, but you remember, in substance, Simon's testimony of overhearing the conversation in the bathroom,

where Simon, with his professional experience, after hearing and reaching a determination that this defendant Byrnes and Tallmadge had reached agreement on the price, the $25,000.00, that Byrnes indicated, 'Don't you know what a strain this is, * * *' [Tr., p. 1911, lines 11–17]

\* \* \* \* \* \*

"(b) Then Tallmadge, after a few words, saying, 'It takes seven days. I'm going to get the money. I told them I'd put up my boat for collateral. $25,000.00 is a lot of money.' [Tr. p. 1967, lines 13–16.]

\* \* \* \* \* \*

"(c) Special Agent in Charge Simon, an agent with 23 years' experience, testified he heard right then, and that was enough for him. There was a meeting of the minds at that time on this $25,-000.00 * * * [Tr., p. 1967, lines 22–25.]

\* \* \* \* \*

"(d) There was nobody else in the bathroom. No mistake about the voices. Why else, after Tallmadge says, '$25,000.00 is a lot of money,' would Byrnes say, 'Don't you know what a strain this is on me? You promised you'd have it' ?

"Some mistake, somebody else in the bathroom? No. Agent Simon, an experienced investigator, and here again Mr. Byrnes is the only one in step. Everyone else is incorrect.

"(e) We think this is awfully significant on Counts Seven and Eight of this indictment. Agent Simon's testimony, backing up Tallmadge and backing up all the other events, what else did Byrnes mean, Tallmadge says, '$25,000.00 is a lot of money.' And, 'Don't you know what a strain this is on me? [Tr. p. 1968, lines 2–14.] You promised you'd have it.'

\* \* \* \* \* \*

"(f) Not only the testimony of Tallmadge, the corroborative testimony of Simon. overhearing Byrnes' very words when Tallmadge said, '$25,000.00 is a lot of money.' He says, 'Don't you know what a strain this is on me? You promised you'd have it.' [Tr., p. 1972, lines 1–5.]

\* \* \* \* \* \*

"(g) *Closing Argument on Behalf of the Plaintiff*

"MR. MEDVENE: * * * Simon said without question what he heard in that bathroom and there is no question what was said. It is just the order, so far as Byrnes is concerned. We know what was heard in the bathroom. That Tallmadge indicated $25,-000.00 is a lot of money and Byrnes said, 'Don't you know what a strain this is on me? You promised me you'd have it.' * * *"

From our examination of the record, we find Simon never stated he heard Tallmadge state: "*$25,000.00* is a lot of money." Tallmadge stated *he* said $25,-000.00 is a lot of money. Simon heard Tallmadge say: "I'll get the money," but never mentioned any precise figure which he had heard Tallmadge refer to.

Thus in six references in opening argument and once in closing argument, Mr. Medvene quoted the $25,000.00 figure. On his second, fourth and seventh statements, Mr. Medvene was strictly accurate. On his first, third, fifth and sixth statements, Mr. Medvene may have been technically accurate, but an inference could clearly be drawn by the jury which the factual testimony does not, in our opinion, strictly justify.

The reference in the written document was not before the jury and could not have influenced it. (It may, however, indicate there was an honest misunderstanding by government counsel of the precise language used by the witness Simon.)

**840**

Appellant's counsel failed to raise the point, now urged as error, either when the statements were made in the government's opening argument, or in answering them in appellant's counsel's argument to the jury, save to point out in argument that "What he [Mr. Simon] says he heard in the bathroom has nothing to do with $25,000.00 being a lot of money, and both the two men who were in the bathroom, both say this was said." (Tr. p. 2036.) Further, no cautionary instruction was asked for, or even suggested to the court.

In support of appellant's present charge (that government's counsel's inference that the witness Simon had heard the figure $25,000.00 used in the bathroom conversation between Byrnes and Tallmadge was prejudicial error), we are cited to the case of Berger v. United States, 1935, 295 U.S. 78, 84, 55 S.Ct. 629, 631, 79 L.Ed. 1314. That case recites the conduct of the United States Attorney in that case in the following language:

"That the United States prosecuting attorney overstepped the bounds of that propriety and fairness which should characterize the conduct of such an officer in the prosecution of a criminal offense is clearly shown by the record. He was guilty of misstating the facts in his cross-examination of witnesses; of putting into the mouths of such witnesses things which they had not said; of suggesting by his questions that statements had been made to him personally out of court, in respect of which no proof was offered; of pretending to understand that a witness had said something which he had not said and persistently cross-examining the witness upon that basis; of assuming prejudicial facts not in evidence; of bullying and arguing with witnesses; and in general, of conducting himself in a thoroughly indecorous and improper manner."

No such language nor any similar language could be used here to truth-

fully describe what occurred at the trial of this case. No such course of conduct here existed. And the same comment applies with respect to Fitter v. United States, 2 Cir. 1919, 258 F. 567, 573 (where the government counsel made continued and repeated reference to World War I, over defense objections), and to Johnson v. United States, 7 Cir. 1914, 215 F. 679, 685, L.R.A.1915A, 862, (erroneously cited by appellant as 215 F. 201); (with the there improvident reference, without proof, of defendant's "immoral purpose * * * too obscene to mention," which the prosecuting attorney then proceeded to mention).

We could wish that counsel on both sides in every case would exercise meticulous care to stay with the precise language used by witnesses in testifying, when they purport to repeat it. A reading of the reporter's transcript of the precise language used by the witness is the only safe way to be accurate—yet any judge of considerable trial experience knows such fastidious conduct is not, and sometimes cannot be, expected. The emotions in this case ran high, on both sides of the counsel table. We would hope that absolute accuracy in quoting witnesses' testimony would always prevail in every courtroom. Yet we cannot hold it reversible error when a careful and minute examination *after trial* discloses some disputed and, at best, an inferred discrepancy between the purported quotation and what the witness actually said—a discrepancy apparently not sufficiently large to merit interruption and objection during argument; or any mention in the instructions to the jury.

The error here complained of, if it was error, was *de minimis* and insufficient to cause us to reverse this factually complicated case, in view of all the testimony present in the record as to appellant's guilt. Cf. Fitter v. United States, supra, 258 F. at 570. As this court said in Diggs v. United States, 9 Cir. 1915, 220 F. 545, at 557, affirmed 242 U.S. 470, 37 S.Ct. 192, 61 L.Ed. 442. nothing in the record is "so offensive or inflammatory in the remarks of counsel for the govern-

ment as to require us on that ground to reverse the judgments."

XII. *The appellant was substantially prejudiced and deprived of a fair trial by reason of government counsel's use of a bound volume of the transcript of testimony from the second trial.*

 This point, to which admittedly no objection was made at the trial, was not preserved for appeal. But if it had been, it is of such triviality as to be of no merit.

Finding no reversible error, we affirm.