STATE v. CHARLES F. JOHNSON and Another.

July 12, 1899.

Nos. 11,705—(20).

**Grand Larceny.**

> The defendant was convicted under the provisions of G. S. 1894, § 6711, making the obtaining, with intent to defraud, the property of another by aid of a worthless check, larceny. *Held,*

**Same—Passing Bank Check.**

> That in giving a check or draft a party does not necessarily represent that he then has with the drawee funds out of which it will be paid, but he does represent by the act of passing it that it is a valid order for its amount, and that the existing state of facts is such that it will be paid in the ordinary course of business.

**Verdict Not Sustained by Evidence.**

> That the verdict of guilty in this case is not sustained by the evidence.

John S. Lord and Charles F. Johnson were indicted in the district court for Le Sueur county for grand larceny in the second degree. The case was tried before Cadwell, J., and a jury, which rendered a verdict of guilty against defendant Johnson, the indictment having been dismissed against defendant Lord. From an order denying a motion for a new trial, defendant Johnson appealed. Reversed.

*A. A. Stone* and *Smith & Parsons,* for appellant.

*W. B. Douglas,* Attorney General, and *C. W. Somerby,* Assistant Attorney General, for the State.

START, C. J.

The defendant was convicted of the crime of grand larceny in the second degree in the district court of the county of Le Sueur, and appealed from an order denying his motion for a new trial. The indictment is based upon G. S. 1894, § 6711, which is in these words:

"A person who wilfully, with intent to defraud, by color or aid of a check or draft, or order for the payment of money or the delivery of property, when such person knows that the drawer or maker thereof is not entitled to draw on the drawee for the sum specified

therein, or to order the payment of the amount, or delivery of the property, although no express representation is made in reference thereto, obtains from another any money or property, is guilty of stealing the same, and punishable accordingly."

The gist of the offense defined by this statute is the obtaining, with intent to defraud, the money or property of another by false pretenses; that is, by color or aid of a check or draft which the accused has no reason to believe will be paid. In negotiating a check the maker does not necessarily represent that he then has with the bank funds out of which it will be paid, but he does represent by the act of passing the check that it is a good and valid order for its amount, and that the existing state of facts is such that in the ordinary course of business it will be met; or, in other words, he impliedly represents that he has authority to draw the check, and that it will be paid on presentation. Such authority need not be expressed, but it may be inferred from the course of dealing between drawer and drawee. 7 Am. & Eng. Enc. 738; Queen v. Hazelton, L. R. 2 Crown Cas. 134; Com. v. Drew, 19 Pick. 179; Barton v. People, 35 Ill. App. 573. Therefore if the defendant in this case, when he negotiated the check here in question, had good reason to believe, and honestly did believe, that he had authority to draw it, and that the then existing state of facts was such that the check would be paid in the ordinary course of business, he is not guilty of obtaining money by false pretenses, although the check was not in fact paid for want of funds. If such be this case, the intent to defraud, the gist of the alleged offense, would be wanting. On the other hand, if he did not have any reasonable cause for believing that he was entitled to draw the check, and that it would be paid, the jury would be justified in inferring from such a state of facts that he intended to defraud by color or aid of the check, and he was rightly convicted.

The important question, then, in this case, and the only one we deem it necessary to consider, is whether the evidence is sufficient to sustain the verdict of guilty.

The evidence on the part of the state was to the effect following: The Lord Milling Company, a corporation, and hereinafter designated as the "corporation," had been engaged in the business of buying wheat and manufacturing it into flour at Elysian, in Le

Sueur county, for more than five years next before July 28, 1898. John S. Lord was its president, and the defendant Charles F. John: son was its secretary and treasurer. It did its banking business during this time with the Bank of Waterville, located at Waterville, this state, seven miles distant from Elysian. When the corporation needed money for immediate use in purchasing wheat for its mill, it was accustomed to draw its check on the Bank of Waterville, payable to J. S. Morton & Co., doing a banking business at Elysian, and get the cash on it. The account of the corporation with the bank was overdrawn "off and on" for a year before the making of the check here in question, but its checks were always paid by the bank. This overdraft amounted on June 15, 1898, to $4,600, and on that day the cashier of the bank wrote to the corporation, stating the amount thereof, and requesting that it be adjusted. Thereupon and on the next day Lord and Johnson went to the bank, and gave to it the note of the corporation for $5,000, dated on June 16, 1898, payable, with interest, in 45 days after date, and secured its payment by a pledge of the stock of the corporation. The cashier testified that this note was taken, not in payment of the overdraft, but as collateral security for its payment. Nothing was said at this or any other time with reference to a discontinuance of the practice of making overdrafts by the corporation. On the contrary, the bank continued to pay all the checks of the corporation to July 23, 1898, inclusive. The cashier's testimony on this point is this:

"Q. Was there anything said at that time with regard to their payment of the note or the payment of the overdraft? A. There was as to the payment of the overdraft. Q. And what was said? A. I said to them that I didn't want them to consider they had 45 days' time on that note or on the overdraft. I wanted them to reduce the overdraft at once. Q. And they did, didn't they? A. Yes. Q. And between June 16, 1898, and July 20, 1898, they had reduced it from $4,606.71 to $3,569.88, or more than $1,000, hadn't they? A. Yes, sir. Q. How had they reduced that? A. Well, by remittance. They had made more remittances, but they were drawing out at the same time. Q. Well, now you paid all of their checks,—you honored and paid all of the checks drawn on your bank by the Lord Milling Company from June 16, 1898, to July 1, 1898, didn't you? A. Yes, sir. Q. And you also honored and paid all of the checks drawn on you and presented at your bank between July 1, 1898, and July 23, 1898, didn't you. inclusive? A. Yes, sir."

The defendant Johnson, on July 20, 1898, in the usual course of the business of the corporation, drew its check for $150 on the Bank of Waterville, payable to J. S. Morton & Co., who cashed the check, and the money was used in the business of the corporation. This check was presented to the bank for payment July 25, 1898, and payment refused, and on July 28, 1898, the bank commenced suit against the corporation and attached its property. This was the first refusal of the bank to pay the checks of the corporation, and there was no previous communication between them as to the overdraft, except that the cashier sent to the corporation its usual monthly statement on July 1, which showed that the $5,000 note had not been credited on the account, and that there was an overdraft. Two days subsequent to the making of this check the bank cashed 11 checks of the corporation, aggregating $730, and on the third day thereafter it paid a further check of the corporation amounting to $176, and two days after the making of such check the corporation deposited $608 on account with the bank, and between June 16, the time of the making of the note, and July 25, the corporation paid into the bank on its overdraft or note some $1,600. There was only slight, if any, evidence that the corporation was insolvent in fact at the time the check was made. So much for the evidence on the part of the state.

The case was dismissed as to Lord, on motion of the prosecution, at the close of the evidence for the state. Both Lord and the defendant testified that their understanding was that the $5,000 note paid the overdraft, and that it was given for some $400 more than the overdraft, so that they would have enough to their credit to pay their checks until they made further deposits; that the cashier first wrote a note for the exact amount of the overdraft, but, on the suggestion of the defendant and for the purpose stated, the cashier prepared a new note for $5,000, which was executed on behalf of the corporation. This evidence as to changing the amount of the note and the reason therefor was not contradicted by the cashier, nor did he offer any explanation why the change was made, or why the note was finally made for $400 more than the overdraft, if it was taken simply as collateral thereto. The defendant also testified that, at the time he made the check and received the money thereon

for the corporation, he believed that he had a right to do so, and that the corporation had funds in the bank to meet it. It is not clear on the face of the record that the preponderance of the evidence, on the question whether the note was given to adjust the overdraft, is not in favor of the defendant. But, assuming, as we must, for the purpose of this appeal, that the cashier's testimony on this question is entirely correct, and that there was an overdraft at all times after the note was given, still the undisputed evidence is well-nigh conclusive that the defendant had good reason to believe, and did honestly believe, at the time he made the check in question, that he was entitled to draw it, and that it would be paid in the usual course of business, and that he had no intention of defrauding any one by the check or otherwise.

We are in full sympathy with the suggestions of the attorney general that business interests must not be jeopardized with impunity by dead beats and kiters drawing and circulating worthless checks, but such is not this case. The evidence so absolutely fails to show that the defendant made the check and received the money thereon, with intent to defraud, that we should be false to our duty if we failed to set the verdict of guilty aside. It is clear from the course of business between the bank and the corporation that the latter was impliedly authorized to make overdrafts, and that the authority was not revoked until after the check in question was made. The most that can be claimed from the evidence is that the corporation was to draw no more checks on the bank, unless the overdraft was reduced. This condition was complied with, and the bank continued without objection to pay the checks of the corporation after the giving of the note, as it had done before. Two days after the check in question was made and negotiated, the bank paid 11 checks of the corporation aggregating $730, and three days thereafter another for $176; and the corporation, two days after the check was drawn, deposited with the bank an amount four times greater than the amount of the check. These facts are radically inconsistent with the claim that the defendant intended to defraud J. S. Morton & Co. or any one else when he negotiated the check of the corporation for its use and benefit.

The verdict is clearly unsupported by the evidence, and it is set aside, and a new trial granted.