[Crim. No. 5026.   Second Dist., Div. Three.   Oct. 28, 1953.]

THE PEOPLE, Respondent, v. DANIEL JAMES GRIFFITH, JR., Appellant.

874

[PEOPLE v. VALLÉE]

Charles C. Montgomery, Jr., for Appellant.

Edmund G. Brown, Attorney General, and Norman H. Sokolow, Deputy Attorney General, for Respondent.

VALLÉE, J.—Defendant was charged in each of two counts with the offense of issuing checks without sufficient funds. (Pen. Code, § 476a.) Count I alleged that on October 10, 1952, defendant drew and delivered to Walter Munstenteiger a check for $25 drawn on the Bank of America with intent to cheat and defraud Munstenteiger, Von's Market, and Lynwood, California, Branch of the bank, knowing at the time he had not sufficient funds in or credit with the bank to meet the check in full on presentation for payment. Count II contained similar allegations, the date being October 16, 1952, and the amount $27. The parties were the same except that defendant was alleged to be the person to whom the check was drawn and delivered. The court, sitting without a jury, found defendant guilty as charged in each count. He appeals from the judgment.

Defendant's principal contention is that there was no evidence of an intent to defraud.

The parties stipulated that the checks were made and issued by defendant for value to Von's Market on the dates charged, and that at the time of the issuance and delivery of each of them he did not have sufficient funds in or credit with the bank to meet payment in full on presentation. Prior to October 1, 1952, defendant had lived in Compton, California, and had had an account with the Compton Branch of the Bank of America. He moved from Compton to South Gate, and on September 30, 1952, he opened an account with the Lynwood Branch of the Bank of America. About October

1st defendant presented a check signed by him and drawn on the Compton Branch to Munstenteiger, assistant manager of Von's Market in Lynwood, which was cashed by Von's Market and dishonored. During the following week defendant went into Von's Market and told Munstenteiger the check would not be good because he had written it on the wrong branch. Munstenteiger then changed the word Compton on the check to Lynwood and took it to the Lynwood Branch where it was honored. When defendant told Munstenteiger the check was written on the wrong branch he neglected to enter the amount of the check, $25, in his checkbook. With this exception, all checks presented by defendant to Munstenteiger prior to October 10th had been honored. The record does not disclose the number. On October 10th there was a balance of $6.39 in the account. On that day, defendant presented the check of that date to Munstenteiger, who authorized its payment. Defendant cashed it at the checking counter in the market. On October 11th defendant deposited $70.98 in the Lynwood account. On October 16th defendant presented the check of that date to Munstenteiger who authorized its payment; defendant cashed it at the checking counter in the market. On that day there was 27 cents in the account. On October 22d or 23d defendant went to Munstenteiger and told him he (defendant) expected a couple of his checks back, that he would have the money in the bank to cover them, and that they would be taken care of that week end when he got his paycheck. Munstenteiger told him: "Don't worry about it. They will be taken care of."

Munstenteiger testified that prior to October 23d "we had checks that went through, and some that didn't"; that as to the checks which did not go through, he did not discuss the matter with defendant, but simply sent them through again and they were honored, with the exception of those of October 10th and 16th; that about October 23d defendant told him those of the 10th and 16th were going to be dishonored and they were dishonored on the following day. Defendant testified that at that time he had a $100 bonus check coming from the place where he had previously worked and was to receive a paycheck of $70 that week end; he collected the $70 on the 24th. He had been fined by the municipal court on a charge which is not disclosed. On the 24th he appeared in the municipal court and asked for an extension of time within which to pay the fine. The court excused him from the fine and ordered that he spend the week end in jail, to be released

the following Monday morning in order to get to work. Munstenteiger learned that defendant was in jail, became alarmed and had the complaint in the present case issued.

On October 3d defendant gave his landlady a check for $30 and on October 10th another check for $30. Several days later his landlady told him one of the checks had been returned by the bank and that she had been advised the other check was going to be returned. Defendant gave her $60 in cash and she gave him the $30 check which had been returned and a receipt for the other one.

On October 28th a policeman had a conversation with defendant in which the officer showed him the checks of October 10th and 16th which had been cashed at Von's Market. Defendant stated he had cashed them, that at the time he did not keep an account of the checks he was cashing, therefore he did not know the amount he had in the bank at the time he wrote the checks; that he thought some of them might come back N.S.F., but he had tried to plan on taking care of them in the future.

Defendant testified that about October 22d or 23d he discovered his bank account was overdrawn and: ''Q. By MR. MONTGOMERY: Now, when you found that your account was overdrawn, what did you do about it? . . . A. I called the bank the following day. Q. All right. Now, what did you do about it, as far as the Von's Market is concerned? A. Nothing at that time. Q. When did you talk to the Von's Market about it? A. Oh, not for about three or four days later.'' He testified he did not on either October 10th or 16th know that his account was overdrawn and that he did not intend to defraud. He further testified: ''Q. And you passed a check, sometime before the 10th of October, at Von's Market, in the amount of $25.00, and that check was on the Bank of—the Compton Bank, and you ultimately made arrangements to have the name 'Compton' changed to 'Lynwood'; is that right? A. Yes, sir; the same bank, but a different branch. Q. And that threw your accounting off $25.00; is that right? A. Yes, sir. Q. Other than this $25.00 check that was drawn on Compton and later corrected to Lynwood, did you have any other accounting problems in your account? A. Yes, sir, I did. Q. Tell me this: This receipt—this rent receipt—is that what it is? A. Yes— no, sir; it is not a rent receipt. It is a receipt for a check that she said was going to be returned. Q. It is a receipt for two $30.00 checks which you made good to your landlady?

A. Just one, because the other check she gave me, but this one she didn't have yet to give me. Q. One of them was made good by the exchange of the check, and the other one was made good by sort of anticipation; is that it? A. Yes, sir. Q. Now, do you have any explanation as to why these two $30.00 checks bounced, or were about to bounce, when this $25.00 check was the only amount your account was off? A. Well, yes, I do, in that I couldn't understand, at the time, and I called the bank the following day, and they said I had $57.00 in the bank. . . .

"THE WITNESS: I don't honestly understand it myself, why I was overdrawn, except that I called the bank and they said I had $57.00. That was after this happened. And I gave her sixty. The following day I called the bank and I had fifty-seven, but I had made a deposit between the time this check was written and the time that I called the bank. All my deposits were made by mail, and the only thing that occurred to me was that one of my mail deposits had not gotten to the bank before the check did.

"Q. By MR. FINNERTY: I note the receipt is dated the 17th. When were the two $30.00 checks given? A. October 10th. Q. And on October 10th, you gave a $25.00 check to Von's and two $30.00 checks to your landlady; is that right? A. Yes, sir—no, sir. I don't think I gave a $25.00 check to Von's. It was returned October 10th, drawn on the Compton Branch. Is that the one? Q. You gave this $25.00 check to Von's on October 10th, did you not, drawn on the Lynwood Bank? A. Oh, this is the one, yes, sir. That's right. Q. Then you wrote at least three checks on the 10th, two to your landlady and one to Von's? A. Two to my landlady and one to Von's, yes. Q. And, as near as you know, you had funds in the bank to clear all of them, except that you were $25.00 off because a Compton check, unknown to you, had cleared through Lynwood; is that it? A. Yes, sir. Q. Well, do you have any explanation as to why the $27.00 check bounced on the 16th, then? A. Yes, sir. That is what I was starting to say. I called the bank and they said I had $57.00 in the bank, so I figured since I had already paid out $60.00 out of my own pocket, that wasn't being charged to my account, and that I was entitled to add that $60.00 to my account, figuring that I must have a balance of $117.00. Q. I am going to ask you one more question: How much money did you have to pay out of your pocket to pick up all of the overdrawn checks you wrote

during the month of October? A. Well, I gave my landlady $60.00. Q. All right. A. I believe that was all. Q. You had to put out $27.00 to pick up the one written on the 16th, didn't you? A. No, sir. That wasn't until November. Q. The question was, how much money did you have to put out of your own pocket to pick up all of the checks you wrote during the month of October that were overdrawn? A. I am sorry. Q. Two to your landlady; that is sixty. One here that is twenty-seven. Is that right? A. Yes. Q. One here that is twenty-five; is that right? A. Yes. Q. Now, there were other checks, too, were there not? A. Yes. Q. What are the amounts of the other check? . . .

"Q. By Mr. FINNERTY: The amounts of the other checks? A. There was another one for $25.00, that I recall. Q. All right. Any others? A. There were two for $5.00. Q. Any others? A. I believe that was all. Q. All right. Now, that is $147.00 worth of checks that you had to pick up, or put out money to pick up, that you wrote during the month of October, and the only explanation you have for these checks not clearing through your account is that a $25.00 check, written on Compton, had to be changed to Lynwood, and that wasn't entered in your record; is that true? A. No, sir. That is one of the reasons. Q. All right. Please favor us with the others, if there are any. A. Well, as I said, when I paid out $60.00 to my landlady, I credited my account with $60.00, and then I found later that, instead of adding that $60.00, I should have——

"THE COURT: Wait a minute. You paid $60.00 to your landlady? THE WITNESS: Yes, your Honor.

"THE COURT: Why did you credit your account? THE WITNESS: Well, because I had deducted that $60.00 from my account when I wrote the check.

"THE COURT: You said when you got the checks back——

"THE WITNESS: I figured I had got $60.00 more than I thought I had.

"THE COURT: Well, the checks weren't any good, so how could they represent money?

"THE WITNESS: Well, I don't know about that, your Honor.

"THE COURT: As I understand you, you wrote $60.00 worth of checks, and they weren't any good, and you got the checks back. Therefore, you had $60.00 additional money, or more money; is that right?

"THE WITNESS: Well, they were good when I called the bank. . . . Q. What do you mean, they were good when you called the bank? A. When I called the bank, they said I had $57.00 in the bank. Well, I was $3.00 short of having enough to cover them. Q. Now, at the time you added the $60.00 instead of subtracting it from your account, that made a difference in the amount that you thought you had in the bank, didn't it? A. How was that again? (Question read by the reporter.) A. Oh, yes, of course. Q. When did you pick up the checks, the $70.00 worth of checks, that you didn't write to Von's Market? In the month of October or the month of November? A. The month of November, after I was released. Q. No. I am including the landlady's check. When did you pick up the landlady's check? A. Oh, well, that was about the 17th of October. Q. Now, did you write the two checks to the landlady on the 10th of October? A. No. One of them was a week before that. That was the one she had back. The one dated October 10th was the one she didn't have back, the one she gave me the receipt for. . . .

"THE COURT: Well, what was the great hope that animated you when you wrote $147.00 worth of checks in the month of October? What were your great expectations that caused you to believe that maybe money would materialize from some place to meet those checks?

"THE WITNESS: I didn't think it was necessary that any money materialize to meet them, your Honor.

"THE COURT: You thought you had that money?

"THE WITNESS: Yes, sir.

"THE COURT: But your difficulty that you had stated to the court is that you made a mistake of $25.00?

"THE WITNESS: And in another one of $120.00, your Honor.

"THE COURT: What is the $120.00?

"THE WITNESS: Adding $60.00 to my account instead of subtracting, or instead of not adding it, or—I'm not sure which, but I shouldn't have added it, anyway. . . .

"THE COURT: In other words, if you write two bad checks for $60.00 and the checks come back, and you haven't got money in the bank to cover the checks, then you are $60.00 ahead; you have made $60.00?

"THE WITNESS: No, sir. It was not to my knowledge, your Honor, that there wasn't enough money in the bank to cover the checks.

880

"THE COURT: But you knew the two $30.00 checks came back?

"THE WITNESS: Yes, sir.

"THE COURT: So, when you knew that, you knew there wasn't enough money in the bank to cover it.

"THE WITNESS: But I had still deducted that from my figures and my deposits, so, when I paid it out of my pocket, wouldn't I be entitled to add that back again?

"THE COURT: Well, I don't know how the bank would know that, unless you sent them a radio or telegram. Did you tell the bank about it?

"THE WITNESS: No, sir, the bank wouldn't know about that, I realize that."

■ An intent to defraud the person to whom the check was delivered is an essential element of the offense charged. (*In re Scott*, 85 Cal.App. 170, 172 [259 P. 101].) It is the gist of the offense. (*People* v. *Gaines*, 106 Cal.App.2d 176, 180 [234 P.2d 702].) ■ No presumption of law will suffice for proof of the intent to defraud. (*People* v. *Landman*, 103 Cal. 577, 580 [37 P. 518]; *People* v. *Becker*, 137 Cal.App. 349, 352 [30 P.2d 562].)

■ In negotiating a check, the maker does not necessarily represent that he then has in the bank funds out of which it will be paid; but he only represents, by the act of passing the check, that it is a good and valid order for its amount and that the existing state of facts is such that in the ordinary course of business it will be paid on presentation. ■ One who negotiates a check with knowledge he has not sufficient funds in the bank to meet it—but who has good reason to believe, and honestly does believe, that it will be paid—cannot be said to have an intent to defraud the payee of the check. (See cases collected 35 A.L.R. 384; 95 A.L.R. 499.) ■ Reasonable expectation of payment constitutes a defense to the charge. (*People* v. *Becker*, 137 Cal.App. 349, 354 [30 P.2d 562].)

■ We are of the opinion there was no substantial evidence of an intent to defraud. The prosecution was required to establish beyond a reasonable doubt that defendant intended to defraud Von's Market, not some other corporation or individual. The evidence negatives any intent to defraud Von's Market. When the check of October 1st was written on the wrong branch of the Bank of America and defendant discovered that fact, he immediately informed Munstenteiger; the name of the branch was changed; and the check was honored. This check was for $25 and defendant neglected

to deduct it in his checkbook. The next day after writing the check of October 10th, defendant deposited $70.98 in his account. For some reason not disclosed, the prosecution did not introduce the bank record of defendant's account in evidence. Shortly after writing the check of October 16th, defendant went to Munstenteiger and told him the checks of the 10th and 16th would be returned and that they would be taken care of that week end when he received his paycheck. Munstenteiger told him not to worry about it, that they would be taken care of. Defendant received his paycheck on Friday, the 24th, but before he could deposit it he was incarcerated and then arrested on the present charges. Defendant covered the checks of the 10th and 16th immediately on his release on Monday, November 3d. Prior to defendant's arrest all checks he had presented to Munstenteiger had been honored, with the exception of those of the 10th and 16th; some went through and some did not. "As to those checks which did not go through," Von's Market simply sent them through again and they were honored. When Munstenteiger authorized payment of the checks of the 10th and 16th he was not deceived. He knew they might be dishonored on first presentation for payment and later paid. On these facts, the evidence with respect to defendant's transactions with his landlady does not indicate an intent to defraud Von's Market. When he was informed by his landlady that one of his checks to her had been dishonored and that the other one would be, he gave her the amount of them in cash.

█ Intent to defraud is an intent to commit a fraud. " 'As defined by lexicographers, the word "defraud" means to deprive of right, either by procuring something by deception or artifice, or by appropriating something wrongfully.' " (*People* v. *Wilkins*, 67 Cal.App. 758, 762 [228 P. 367].) The record is devoid of any evidence of deception or artifice. The most the evidence convicted defendant of is carelessness, negligence, and being a poor bookkeeper. Munstenteiger was not deceived. If this conviction were to stand, many a reputable individual would be subject to criminal prosecution for mere carelessness and poor bookkeeping.

The judgment is reversed.

Shinn, P. J., and Wood (Parker), J., concurred.

Respondent's petition for a hearing by the Supreme Court was denied November 24, 1953.