**UNITED STATES of America,
Plaintiff,**

v.

**Howard GILLIAM, Defendant.**

**No. 36339.**

United States District Court
C. D. California.

July 21, 1967.

**508**

Manuel L. Real, U. S. Atty. (at time of indictment and trial but since November 14, 1966 and presently, United States District Judge, Central District of California); John K. Van de Kamp, U. S. Atty., November 14, 1966—March 29, 1967; Wm. M. Byrne, Jr., U. S. Atty.,

March 30, 1967 to present; Robert L. Brosio, Asst. U. S. Atty., Chief, Criminal Division; Arthur I. Berman, Asst. U. S. Atty., Los Angeles, Cal., for plaintiff.

Allen Kaufmann, Beverly Hills, Cal., for defendant.

## DECISION, FINDINGS OF FACT AND CONCLUSIONS OF LAW

HAUK, District Judge.

Indictment in twelve counts, charging eight counts of mail fraud and four counts of wire fraud against three defendants for allegedly implementing a "check-kiting" scheme. After dismissal of one defendant and plea of *nolo contendere* by a second, the case proceeded to jury trial against the remaining defendant for six days, at the conclusion of which the jury deliberated for two more days but wound up in a hopeless deadlock and was discharged.

Prior to the jury submission, defendant moved for judgment of acquittal, the Court reserved ruling thereon and the motion was renewed after the jury was discharged. The Court now holds that the evidence in the case, considered in the light most favorable to the Government, is sufficient to support a verdict against defendant and should be submitted to and passed upon by a jury. Therefore the Court orders that the motion for judgment of acquittal be denied, declares a mistrial and sets the cause down for new trial.

This is a prosecution brought under an indictment in twelve counts charging defendant Howard Gilliam and codefendants Manuel Cohen and Florence Cohen with eight counts of mail fraud in violation of 18 U.S.C.A. § 1341[1] and four

---

1. "§ 1341. *Frauds and swindles*
Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or other article, or anything represented to be or intimated or held out to be such counterfeit or spurious article, for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the

counts of wire fraud in violation of 18 U.S.C.A. § 1343.[2]

The indictment charges that the three defendants, Manuel Cohen, Florence Cohen, and Howard Gilliam, had devised and intended to devise a so-called "check-kiting" scheme and artifice to defraud the Beverly Hills National Bank and others, and that in carrying out the scheme they had utilized the United States mail.

The basic plan and device charged in the indictment is the classic "check-kiting" operation. It is alleged that there would be and were maintained by Cohen, Mrs. Cohen and Gilliam six individual and separate checking accounts at six different banks which they utilized as fraudulent contrivance.

The primary and only local account was maintained in the name of Atlantic-Pacific Auto Leasing, Inc., at the Beverly Hills National Bank, Beverly Hills, California, upon which the defendants Manuel Cohen and Howard Gilliam were authorized to write checks. Four accounts, each in the name of Florence Cohen, were located in Covington, Louisiana; Houston, Texas; Gulfport, Mississippi; and Las Vegas, Nevada. The sixth account, in the name of Manuel Cohen, was located in Syracuse, New York.

As a further part of the scheme and artifice to defraud, it is alleged that beginning about May 24, 1963 and continuing to about May 31, 1963, the defendants Cohen and Mrs. Cohen would and did cash and deposit at the Beverly Hills National Bank a series of checks drawn on the five out-of-state accounts, knowing that at the time they were so cashed and deposited, the funds on deposit in these out-of-state accounts were insufficient to pay the checks drawn upon them and deposited in the Beverly Hills National Bank, and that the defendants did not have and would not have sufficient funds with which to cover those checks when they would be presented for payment.

It is further alleged that these checks were sent by United States mail and that the defendants knew that they would be sent by mail from the Beverly Hills National Bank to the out-of-state bank accounts for presentation for payment; that prior to the arrival of the checks at the out-of-state banks for presentation for payment, the defendants would and did make withdrawals by checks drawn on the Beverly Hills National banks to cover the prior checks upon withdrawals by wire to the out-of-state banks to cover tthe prior checks upon their presentation for payment; that for the purpose of executing this scheme and device the defendants placed in the mail or caused to be placed in the mail certain letters or other matter, including checks, to be delivered by the Post Office establishment of the United States, as charged in Counts 1, 2, 3, 7, 8, 9, 11, and 12; and in addition thereto transmitted by wire funds on several different occasions, as charged in Counts 4, 5, 6, and 10.

Post Office Department, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined not more than $1,000 or imprisoned not more than five years or both."

2. "§ 1343. *Fraud by wire, radio, or television*

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined not more than $1,000 or imprisoned not more than five years, or both.

Of course, it is finally charged in the indictment that this "check-kiting" scheme and artifice along with the various mailings and wires add up to what has been referred to, for lack of a better or shorter term, as *mail* fraud in violation of 18 U.S.C.A. § 1341, and *wire* fraud in violation of 18 U.S.C.A. § 1343.

The defendant Manuel Cohen pled *nolo contendere,* and sentencing in that matter has been continued by the Court to await the outcome of the Gilliam matter.

The defendant Florence Cohen was dismissed from the case by the Government.

Thereupon the case of United States v. Gilliam came to trial in this Court, and upon evidence adduced for six days the matter was submitted to the jury. After two days of deliberation the jury returned and asked for further instructions. Having received such instructions the jury again deliberated, but without conclusive result, disagreeing and finding no reasonable probability of arriving at a verdict. The Court thereupon discharged the jury.

Prior to the submission of the matter to the jury, motion for judgment of acquittal was made on behalf of the defendant Gilliam pursuant to Rule 29 of the Federal Rules of Criminal Procedure, but the Court reserved decision on the motion and submitted the case to the jury. This motion for acquittal, then, is before the Court after the discharge of the jury without having returned a verdict.

It might be noted parenthetically, that upon inquiry by the Court after discharge, the jury indicated that they could not arrive at a verdict, standing deadlocked eight to four for acquittal; that when the jury first started deliberations they stood seven to five for conviction; that at the time the Court reinstructed the jury on certain points of law, they stood seven to five for conviction; and that prior to the time of final disagreement they stood six to six, finally winding up eight to four for acquittal.

Now, the Court having duly considered the briefs on both sides—opening, reply, supplemental, and supplemental reply—having heard the arguments, and having taken the matter under submission, the time has come for ruling on this motion for judgment of acquittal.

This is not an easy matter to resolve. First we must look at the facts; and then we must apply the law that has been laid down in the appellate cases for the guidance of the trial courts. This is what we shall try to do as briefly as possible.

The Court being fully advised in the premises now makes its Findings of Fact and Conclusions of Law as follows:

### FINDINGS OF FACT

#### Business Difficulties—Shortage of Working Capital

The defendant Gilliam was joined with the defendant Manuel Cohen in an enterprise known as Atlantic-Pacific Auto Leasing Company, Inc., which originated as a drive-away business, and then branched out into and almost completely became the business of auto leasing. This was a business which, by the testimony of all the witnesses, required a great deal of working capital or ready cash from time to time, particularly since large sums of money were always tied up in the purchase of automobiles which had to be floored until they were leased out, even though a certain amount of cash was obtained by way of conditional sales contracts, chattel mortgages, or other security transactions customarily used in the business.

In the course of this business, Cohen and Gilliam had a very difficult time raising funds to carry on and pay creditors as things moved in to the month of May 1963. In fact, along about May 14, 1963, the need for cash was desperate and something had to be done.

The defendants had sought the help of the Beverly Hills National Bank where they carried on their banking, but had not been able to raise any additional credits for financing of cars and for paying of creditors, although they did have

some assets in addition to the automobiles which were already heavily covered with finance paper as security for monies already borrowed.

The defendants did have, at this point, some remaining unsold car leases, which could be sold at the discounted value of the remaining lease terms. Negotiations were under way for selling some of these leases to a Mr. Silver in Phoenix, Arizona.

It also appeared that Cohen had initiated some negotiations in Phoenix for a debenture issue, working with a Charles Johnson, then a prominent attorney, and later head of the Federal Housing Agency in the Phoenix area.

Yet the need for new credit became increasingly and extremely severe and the first of a series of checks was written on the six out-of-state accounts which did not have, at the moment of the writing of the checks, sufficient funds to cover them.

The following is a summary of the check transactions in each of the out-of-state banks involved:

### Syracuse Bank Transactions (Manuel Cohen Account)

The first check relevant to this motion for acquittal is a check written on May 16, 1963, for $15,000.00 on the account of Manuel Cohen in the Lincoln National Bank & Trust Company, Syracuse, New York, at a time and date when the balance there was $288.74. This check was in the handwriting of Gilliam and signed by Cohen.

Prior to the time this check arrived for presentment and payment at Syracuse, it was covered by a wire transmittal of $15,000.00 in funds on May 21, 1963, obtained by a check drawn and signed by Gilliam and written on the Atlantic-Pacific account at the Beverly Hills National Bank. This check was dated May 20, 1963, the paid stamp of the Beverly Hills National Bank is marked May 21, 1963, and the check went through the Atlantic-Pacific account on May 21, 1963, when there was an actual balance in the account of $762.49.

The second check was dated May 21, 1963, for the amount of $25,000.00, again drawn on the account of Cohen at the Syracuse bank. This check was written by Gilliam, but signed by Cohen, on a date when the balance in the Syracuse bank was $15,288.74. At this time, of course, there was the previous $15,000.00 check of May 16th outstanding against that balance. This new $25,000.00 check was deposited in the Beverly Hills National Bank, and later covered prior to its presentment for payment in Syracuse by a $20,000.00 wire transmittal from the Beverly Hills National Bank, which sent credits or funds based on a check drawn and signed by Gilliam for $20,000.00 written on the Beverly Hills National Bank, on the date of May 27, 1963, when the balance in this account was a $9,063.94 credit at the beginning of the business day, and a $812.41 deficit at the end of the business day.

The third check drawn on the Syracuse bank was a check dated May 22, 1963 for $23,000.00, again written by Gilliam, signed by Cohen, on a date when the balance was $288.74. It was covered on May 28, 1963 by a wire sending $28,000.00 in credits, based on a check for $28,000.00 signed by Cohen and drawn on the Beverly Hills National Bank, at a time when the balance there was a $812.41 deficit.

The next check drawn on this Syracuse account was on May 31, 1963, a check for $25,000.00, written by Gilliam, signed by Cohen, at a time when the balance in that account was still $288.74. This check was never covered and wound up non-sufficient funds or n. s. f. This is one of the eight checks that will be referred to later as the n. s. f. checks.

### Gallup Bank Transactions (Florence Cohen Account)

We now turn to the next account, which was in the First State Bank in Gallup,

New Mexico, in the name of Florence Cohen. The first check upon that account was dated May 27, 1963, for the amount of $15,000.00, written by Gilliam, signed by Florence Cohen, at a date when the balance in that account was $27.16.

This check was not covered immediately. In the meantime, another check was written on May 29, 1963 for $16,000.00, again written by Gilliam, signed by Florence Cohen, at a time when the balance was still $27.16.

Both these checks were covered by a wire of $31,000.00 on June 4, 1963, based on a check drawn on the bank account of Gilliam & Associates in the Union Bank, Los Angeles, California. Gilliam & Associates is a separate company of defendant Gilliam, which it appears, was the advertising arm of Atlantic-Pacific. At this time the Gilliam & Associates account had a balance of $65,000.00.

Therefore, there are no n. s. f. checks involved in this case drawn upon the Gallup bank because both checks were covered by *bona fide* funds.

### Holbrook Bank Transactions (Florence Cohen Account)

The next account is in the First National Bank of Holbrook, Arizona, in the name of Florence Cohen. On this account the first check drawn was dated May 28, 1963, for $15,000.00, written by Gilliam, signed by Florence Cohen, and deposited in the Beverly Hills National Bank at a time when the balance in the Holbrook bank was $34.19.

The second check was dated May 29, 1963, for $14,000.00, written by Gilliam, signed by Florence Cohen, and deposited in the Beverly Hills National Bank at a time, again, when the balance in the Holbrook bank was still $34.19.

These two checks were covered by two wires, both of June 4, 1963, one of which went from the Citizens National Bank of Los Angeles, California to the Holbrook bank, and was based upon a check drawn on the account of Gilliam & Associates at the Union Bank of Los Angeles. The second wire went from the Union Bank of Los Angeles, and was based upon the account of Gilliam & Associates with that bank. Both of these sums, therefore, came from the Gilliam & Associates account at the Union Bank of Los Angeles.

The checks drawn by Gilliam were on the account of Gilliam & Associates at a time when the balance in that account was sufficient to cover these checks. Therefore no n. s. f. checks came back from the Holbrook account.

### Covington Bank Transactions (Florence Cohen Account)

The next account is the Citizens Bank & Trust Company, of Covington, Louisiana, in the name of Florence Cohen.

The first check drawn on this account was dated May 27, 1963, for $15,000.00, written by Gilliam, and signed by Florence Cohen, at a time when the balance in this Covington account was $24.00. This check was deposited in the Beverly Hills National Bank.

The next check was dated May 29, 1963, for $18,000.00, written by Gilliam, signed by Florence Cohen, when the balance in the account was still $24.00. This check was also deposited in the Beverly Hills bank account.

A third check was written, dated May 31, 1963, for $35,000.00, written by Gilliam, signed by Florence Cohen, when the balance in the account was still $24.00.

All of these checks were returned n. s. f., or non-sufficient funds.

### Gulfport Bank Transactions (Florence Cohen Account)

The next account is the Gulf National Bank of Gulfport, Mississippi, in the name of Florence Cohen. The first check drawn on this account was dated May 27, 1963 for $15,000.00, written by Gilliam, and signed by Florence Cohen, at a time when the balance was $29.72.

The next check was dated May 29, 1963, for $18,000.00, written by Gilliam,

signed by Florence Cohen, when the balance was still $29.72.

Both of these checks were deposited in the Beverly Hills National Bank and both were returned non-sufficient funds, or n. s. f.

### Las Vegas Bank Transactions (Florence Cohen Account)

The next account is the Bank of Nevada, Las Vegas, Nevada, in the name of Florence Cohen. The one check drawn on this account was dated May 27, 1963, in the amount of $18,000.00, written by Gilliam, signed by Florence Cohen, at a time when the balance was $291.85.

This check was returned non-sufficient funds, or n. s. f.

### Houston Bank Transactions (Florence Cohen Account)

The next account is the Citizens State Bank, Houston, Texas, in the name of Florence Cohen. The one check drawn on this account was dated May 29, 1963, in the amount of $15,000.00, written by Gilliam, signed by Florence Cohen, at a time when the balance was $61.75. This check was deposited in the Beverly Hills National Bank and was returned non-sufficient funds or n. s. f.

### Phoenix Bank Transactions (Atlantic-Pacific Auto Leasing Account)

The next account is First National Bank of Arizona, Phoenix, Arizona, in the name of Atlantic-Pacific Auto Leasing, Inc. On May 14, 1963, a check in the amount of $6,000.00 was written against this Phoenix account, signed by Gilliam and deposited in the Beverly Hills National Bank, at a time when the Phoenix balance was $994.97. This check was covered on May 17, 1963, by a wire from the Citizens National Bank of Los Angeles, based on a check drawn and signed by Cohen, drawn on the Beverly Hills National Bank account, at a time when the balance in the Beverly Hills National Bank was, as previously indicated, $15,985.51.

The next check, dated May 17, 1963, in the amount of $40,000.00, was written and signed by Cohen, at a time when the account in the Phoenix bank had a balance of $7,874.76. This check was covered by a deposit of cash from the sale of certain leases to Harry Silver in Phoenix in the amount of $46,879.99.

The next check of importance is dated May 24, 1963, in the amount of $7,500.-00, and was written and signed by Gilliam and deposited in the Beverly Hills National Bank at a time when the Phoenix, Arizona account had in it only $2,874.76.

The next check, also dated May 24, 1963, in the amount of $30,000.00 again was written and signed by Gilliam and deposited in the Beverly Hills National Bank, at a time when the Arizona bank balance was still only $2,873.76.

These two checks were covered by a wire in the amount of $39,000.00 from the Citizens National Bank, Los Angeles, California, to the Phoenix bank, based upon a check written and signed by Gilliam, and drawn on the Beverly Hills National Bank at a time when the Beverly Hills account had a $812.41 deficit.

The final check dated May 27, 1963, in the amount of $50,000.00, was written and signed by Gilliam, deposited in the Beverly Hills account, at a time when the balance in the Phoenix bank was $1,-873.76, and was covered on May 29, 1963 by a wire from the Citizens National Bank in the amount of $50,000.00 based on a check written and signed by Gilliam on the Beverly Hills National Bank, at a time when its balance was $47,174.82.

There were no checks returned n. s. f. from this Phoenix bank.

### Lease Sales to Harry Silver

It will be noted that some of the Atlantic-Pacific leases were sold to Harry Silver for the amount of $46,879.99. On May 21, 1963, a deposit was made in the Phoenix bank of funds received by Atlantic-Pacific, or received by Cohen and put into the Atlantic-Pacific ac-

count in Phoenix in this amount of $46,-879.99.

### Negotiations for Debenture Issue

At this same time Cohen was negotiating for what he terms a debenture issue to be sold in Phoenix to a syndicate or group headed by one Kenneth Porter. In these negotiations Cohen was using Mr. Charles Johnson, a Phoenix attorney, later and presently the head of the Federal Housing Agency in the Phoenix area, apparently a man of some wisdom, a man of substance as a lawyer and public official.

Sometime between May 17, 1963 and May 21, 1963, Cohen telephoned Gilliam from Phoenix and said, in effect: "I am at a little celebration or victory party here with Mr. Johnson. He has told me that the debenture issue deal has been line up, it is virtually assured, and the money ought to be forthcoming here most any moment. You might be able to pick up the check on Wednesday."

Cohen was in touch with Gilliam, between Phoenix and Los Angeles from day to day, and through these daily communications Gilliam learned that the completion of the debenture issue was postponed a bit because the financiers were busy on other matters. This postponement continued day after day until Cohen was informed at the end of May that the financiers had purchased a bankrupt newspaper and were not in a position to invest any more capital. Upon learning this, Cohen made a "valiant attempt", as he called it, to sell the remaining leases to Mr. Silver. But this transaction was never consummated.

### The Eight "N.S.F." Checks

Before Cohen left Los Angeles for Phoenix to negotiate further in connection with the debentures, that is, prior to May 17, 1963, he had left eight signed checks with Gilliam, that Gilliam could fill in and use, as Cohen put it, "in case a dire emergency arose," "to cover pressing creditors", until the debenture issue could be completed. These eight checks are the eight checks which were later returned n. s. f. and were all drawn on the bank accounts of Manuel Cohen and Florence Cohen.

As stated above, the n. s. f. checks were eight in number: the first three checks were drawn on the Covington Bank & Trust Company, Covington, Louisiana, in the name of Florence Cohen; two checks on the Gulf National Bank, Gulfport, Mississippi, in the name of Florence Cohen; one check on the Bank of Nevada, Las Vegas, Nevada, in the name of Florence Cohen; one check on the Citizens State Bank of Houston, Texas, in the name of Florence Cohen; and one check on the Lincoln National Bank in Syracuse, New York, in the name of Manuel Cohen. These checks totaled $159,000.00.

These n. s. f. checks or overdrafts on the out-of-state banks, which had been deposited in the Beverly Hills National Bank, were returned to the Beverly Hills National Bank marked n. s. f. or non-sufficient funds.

These n. s. f. checks were all written between the dates of May 24, 1963 and May 31, 1963. These checks were left with Gilliam by Cohen in blank but signed by Florence Cohen or Cohen himself with instructions to Gilliam to use them "if you have to in case of emergency, or dire emergency, to pay pressing creditors."

Cohen admitted that he knew these accounts did not have very much in them, and he understood that Gilliam would use these only in relatively moderate or small amounts, but certainly not in the large amounts in which they were actually written—ranging from a low of $15,000.00 to a high of $35,000.00.

There is testimony, however, that Cohen knew of the large amounts for which these checks were actually written and a wire was sent by Cohen on May 28, 1963 of $20,000.00 from the Beverly Hills National Bank to the Syracuse bank to cover one of them.

Two witnesses testified that they believed Cohen's word that he was a sort of

financial genius, a very wealthy man who had put aside money in large amounts in his children's and his wife's bank accounts. They felt that when Cohen said money was coming through it was going to come through.

So when these eight n. s. f. checks were returned to the Beverly Hills National Bank, the bank contacted Cohen and Gilliam in high hopes of payment. Cohen and Gilliam met with the bank representatives in an attempt to acquire an additional extension of time to allow them to make good on the checks, and to get additional financing. But these efforts came to no avail and they turned over or assigned all of their interest in the car leasing business to the bank in an attempt to make good on the checks.

This was not sufficient to cover the bank's losses, "the whistle was blown" by the bank, the postal inspectors were called in, and the present indictment was returned and. the pending prosecution begun.

It should be noted that, from the evidence presently before the Court, it appears that no defendant personally benefitted from these transactions. Neither Gilliam nor either of the Cohens personally received any part of the monies or credits that were deposited or established by the n. s. f. checks. However, there is no doubt in the Court's mind, and the evidence conclusively shows, that these monies and credits went to pay creditors of their auto leasing business venture.

## CONCLUSIONS OF LAW

This motion for judgment of acquittal is made under Rule 29 of the Federal Rules of Criminal Procedure,[3] and the Court has two courses of action open to it. One is to declare a mistrial and acquit the defendant Gilliam; the other is to declare a mistrial and order a new trial. Which one the Court takes necessarily depends upon the guidelines set by the Federal appellate courts, particularly the Ninth Circuit Court of Appeals.

In the first and leading case of Stoppelli v. United States, 183 F.2d 391, 393 (C.A.9th, 1950), cert. den. 340 U.S. 864, 71 S.Ct. 88, 95 L.Ed. 631 (1950), the court in determining whether or not the evidence was sufficient to sustain the verdict laid down the basic test for directed acquittal:

"We may say that the evidence is insufficient to sustain the verdict *only* if we can conclude *as a matter of law* that reasonable minds, as triers of the fact, must be in agreement that reasonable hypotheses other than guilt

3. *"Rule 29.*
    *MOTION FOR JUDGMENT OF ACQUITTAL*
    (a) *Motion Before Submission to Jury.* Motions for directed verdict are abolished and motions for judgment of acquittal shall be used in their place. The court on motion of a defendant or of its own motion shall order the entry of judgment of acquittal of one or more offenses charged in the indictment or information after the evidence on either side is closed if the evidence is insufficient to sustain a conviction of such offense or offenses. If a defendant's motion for judgment of acquittal at the close of the evidence offered by the government is not granted, the defendant may offer evidence without having reserved the right.
    (b) *Reservation of Decision on Motion.* If a motion for judgment of acquittal is made at the close of all the evidence, the court may reserve decision on the motion, submit the case to the jury and decide the motion either before the jury returns a verdict of guilty or is discharged without having returned a verdict.
    (c) *Motion After Discharge of Jury.* If the jury returns a verdict of guilty or is discharged without having returned a verdict, a motion for judgment of acquittal may be made or renewed within 7 days after the jury is discharged or within such further time as the court may fix during the 7-day period. If a verdict of guilty is returned the court may on such motion set aside the verdict and enter judgment of acquittal. If no verdict is returned the court may enter judgment of acquittal. It shall not be necessary to the making of such a motion that a similar motion has been made prior to the submission of the case to the jury."
    \*     \*     \*     \*     \*
    \*     \*     \*     \*     \*

could be drawn from the evidence. Curley v. United States, 81 U.S.App. D.C. 389, 160 F.2d 229, 230. In the cited case, Judge Prettyman pertinently observes: 'If the judge were to direct acquittal whenever in his opinion the evidence failed to exclude every hypothesis but that of guilt, he would preempt the functions of the jury. Under such rule, the judge would have to be convinced of guilt beyond peradventure of doubt before the jury would be permitted to consider the case.' 160 F.2d at page 233. See also United States v. Perillo, 2 Cir., 164 F.2d 645."

The *Stoppelli* case, as far as we can determine, is the first case in the Ninth Circuit which enunciates this rule, and it is quoted and cited with approval in Ferrari v. United States, 244 F.2d 132, 138 (C.A.9th, 1957), and Corey v. United States, 305 F.2d 232, 237 (C.A.9th, 1962).

The *Stoppelli* decision was followed, three years later, by Remmer v. United States, 205 F.2d 277 at pages 287–288 (C.A.9th, 1953), in the following language:

"The test to be applied on motion for judgment of acquittal in such a case, however, is not whether in the trial court's opinion the evidence fails to exclude every hypothesis but that of guilt, but rather whether *as a matter of law* reasonable minds, as triers of the fact, *must* be in agreement that reasonably hypotheses other than guilt could be drawn from the evidence. Stoppelli v. United States, 9 Cir., 1950, 183 F.2d 391, certiorari denied 340 U.S. 864, 71 S.Ct. 88, 95 L.Ed. 631. If reasonable minds *could* find that the evidence excludes every reasonable hypothesis but that of guilt, the question is one of fact and must be submitted to the jury. Curley v. United States, 1947, 81 U.S.App.D.C. 389, 160 F.2d 229, certiorari denied, 331 U.S. 837, 67 S.Ct. 1511, 91 L.Ed. 1850; Stoppelli v. United States, supra. Judged by this standard, the motion

for judgment of acquittal was properly denied in the present case."

The *Remmer* case was followed by Schino v. United States, 209 F.2d 67 at page 72 (C.A.9th, 1953), where the court considers the question of whether the evidence is sufficient to support the verdict, a question analogous to if not identical with the question raised by the motion for acquittal here:

"In determining this question, we must consider the evidence in the light most favorable to the government. Glasser v. United States, 315 U.S. 60, 68, 62 S.Ct. 457, 86 L.Ed. 680; Woodard Laboratories v. United States, 9 Cir., 198 F.2d 995. Viewed in this light, the state of the evidence is such that a juror's reasonable mind '*could* find that the evidence excludes every reasonable hypothesis but that of guilt'. In such a situation, the case must be submitted to the jury, and their decision is final. Remmer v. United States, 9 Cir., 205 F.2d 277, 287–288, and cases cited."

The *Schino* case is cited with approval in Davenport v. United States, 260 F.2d 591, 598–599 (C.A.9th, 1958), which also relies upon *Remmer*.

Both *Stoppelli* and *Remmer* have been followed consistently down through the years, from 1950 and 1953 to 1964, and we can find no later case.

Charles v. United States, 215 F.2d 831, 834 (C.A.9th, 1954);

Elwert v. United States, 231 F.2d 928, 933 (C.A.9th, 1956);

Eason v. United States, 281 F.2d 818, 821, 87 A.L.R.2d 842 (C.A.9th, 1960);

Cape v. United States, 283 F.2d 430, 433 (C.A.9th, 1960);

Foster v. United States, 318 F.2d 684, 689 (C.A.9th, 1963);

Arraiga v. United States, 323 F.2d 584, 585 (C.A.9th, 1963);

Castro v. United States, 323 F.2d 683, 684 (C.A.9th, 1963);

Byrnes v. United States, 327 F.2d 825, 829 (C.A.9th, 1964);

Woxberg v. United States, 329 F.2d 284, 294 (C.A.9th, 1964).

In Castro v. United States, 323 F.2d 683, 684 (C.A.9th, 1963) the Court summarizes the two different approaches that have been taken in the Ninth Circuit, pointing out that *Foster*, supra, 318 F.2d 684 at 689, used the test:

"The question as to the sufficiency of either direct or circumstantial evidence is whether it is substantial, taking the view most favorable to the Government." 323 F.2d 683, 684, Footnote 1.

whereas *Remmer*, supra, 205 F.2d 277 at 287–288, indicated:

"[T]hat the proper test is whether or not 'reasonable minds *could* find that the evidence excludes every reasonable hypothesis but that of guilt * * * '." 323 F.2d 683, 684, Footnote 2.

But irrespective of these two different approaches, which are discussed in the law reviews,[4] the cases all agree that in a situation such as we have here in the *Gilliam* matter, the question is one of fact and ultimately for the jury as a question of fact, and not to be decided by the Judge as a question of law.

In Byrnes v. United States, 327 F.2d 825, 829 (C.A.9th, 1964) the Ninth Circuit continued and emphasized the teaching of *Castro*:

"But this is not a circumstantial evidence case. Much direct evidence was introduced. It would be incorrect and in fact, impossible, for this court to consider this a case of *circumstantial evidence* alone. We are required, of course, in examining all evidence, whether direct or circumstantial, to draw all favorable permissible inferences to support the jury's verdict, and the judgment below. On appeal we are required, after a conviction, to consider the evidence in an aspect most favorable to the prosecution. Glasser

v. United States, 1942, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680; Noto v. United States, 1961, 367 U.S. 290, 296–297, 81 S.Ct. 1517, 6 L.Ed.2d 836."

Thus the Ninth Circuit rejected the old rule which was disapproved by the Supreme Court in Holland (Holland v. United States, 348 U.S. 121, 75 S.Ct. 127, 99 L.Ed. 150), and which had been in effect throughout the preceding fifteen years by virtue of *Remmer, Schino, Stoppelli* and other cases hereinabove cited.

We might add that *Byrnes* also points out, particularly where there is a combination of circumstantial and direct evidence, as in the *Gilliam* case, the Court must consider the evidence in an aspect most favorable to the prosecution, drawing all legitimate inferences that may be drawn in favor of the prosecution. At the same time we must follow the rule set forth in *Remmer, Stoppelli* and *Schino*, that the Court cannot substitute its judgment for that of the jury. The question is whether reasonable minds *could* find that the evidence does not exclude every reasonable hypothesis but that of guilt. Or, it can be put in the converse.

But either way one states the problem, again and again the courts refer it back to the jury, saying it is not up to the judge to substitute his own personal view of the evidence, but rather to make a decision upon what reasonable men looking at the evidence might reasonably conclude. Woxberg v. United States, 329 F.2d 284, 294 (C.A.9th, 1964).

As we view the cases, then, the rule contended for by the defendant is the old rule, which was disapproved by *Holland* and the matter here is governed by the new rule which *Holland* laid down, and which has been followed by all the cases that we could find in the Ninth Circuit, beginning with *Remmer, Stoppelli, Schino*, and continuing down through *Castro, Byrnes* and *Woxberg* to the present time.

---

4. Goldstein, The State and the Accused: Balance of Advantage in Criminal Procedure, 69 Yale L.J. 1149, 1152–1163 (1960); Note, Sufficiency of Circumstantial Evidence in a Criminal Case, 55 Col. L.Rev. 549–560 (1955).

The cases are clear and we have no alternative but to say, not what this Court believes to be the ultimate way this case should be decided, but merely that it should be submitted to a jury. That depends upon whether or not reasonable men could find any hypothesis other than guilt, or as the cases say, whether or not a reasonable mind could exclude every reasonable hypothesis but guilt.

The question then becomes, could a reasonable mind reasonably conclude, on the basis of all direct and circumstantial evidence involved in this case, that all hypotheses other than guilt have been excluded and that Gilliam is guilty beyond a reasonable doubt? If so, the motion for judgment of acquittal should be denied.

The answer to this question depends upon the inferences to be drawn from the evidence which we have set forth, as to which there is no real disagreement, and upon relevant authorities defining and delineating the essential elements constituting the illegal and fraudulent scheme or plan popularly known as "check-kiting", a Federal offense when carried out by mail or wire.

The twin Federal crimes of mail fraud under 18 U.S.Code § 1341, and wire fraud under 18 U.S.Code § 1343, require proof beyond a reasonable doubt of one common, basic and indispensable element, a specific intent to defraud. Williams v. United States, 278 F.2d 535 (C.A.9th, 1960); United States v. Broxmeyer, 192 F.2d 230 (C.A.2d, 1951); Federman v. United States, 36 F.2d 441 (C.A.7th, 1929), certiorari denied 281 U.S. 729, 50 S.Ct. 246, 74 L.Ed. 1146 (1930).

■■ Relying on and citing a number of state cases, in addition to *Broxmeyer* and *Federman,* the Ninth Circuit by whose teachings we are bound as pointed out in *Williams,* with acts and facts closely paralleling those of the instant case, 278 F.2d 535, 537 (1960).

"[1, 2] Section 1341 requires a specific intent to defraud. United States v. Broxmeyer, 2 Cir., 1951, 192

F.2d 230; Federman v. United States, 7 Cir., 1929, 36 F.2d 441, certiorari denied 281 U.S. 729, 50 S.Ct. 246, 74 L.Ed. 1146. Even where the defendant has knowledge of lack of funds at the time the check is drawn, fraudulent intent is negatived by proof that he had a reasonable expectation that deposits would cover the check at the time it was presented for payment. See People v. Griffith, 1953, 120 Cal. App.2d 873, 262 P.2d 355; Pruitt v. State, 1918, 83 Tex.Cr. [R.] 148, 202 S.W. 81; State v. Foxton, 1914, 166 Iowa 181, 147 N.W. 347, 354, 52 L.R. A.,N.S., 919; State v. Lord, 1899, 77 Minn. 267, 79 N.W. 968. Williams contends that such is the case here.

"The expectation of the defendant must, however, be more than mere hope. The circumstances must be such as to justify a reasonably certain belief that funds will be available. See United States v. Broxmeyer, supra; People v. Becker, 1934, 137 Cal.App. 349, 30 P.2d 562.

"The question before us is whether the evidence was such that a jury could find beyond reasonable doubt that Williams had no such expectation. Schino v. United States, 9 Cir., 1954, 209 F.2d 67, 72, certiorari denied 347 U.S. 937, 74 S.Ct. 627, 98 L.Ed. 1087."

■ The decisions in the State of California compel the same conclusion, based upon the facts before us. In People v. Griffith, 120 Cal.App.2d 873, 880, 262 P.2d 355 (1953), the California court points out that in negotiating a check the maker does not necessarily represent that he has in the bank funds out of which it will be paid. He only represents, by the act of passing the check, that it is a good and valid order for its amount, and that the existing state of facts is such that in the ordinary course of business it will be paid on presentation.

A subsequent California case, People v. Rubin, 223 Cal.App.2d 825, 36 Cal. Rptr. 167, 9 A.L.R.3d 707 (1963) stated virtually the same thing when it quoted

*Griffith* and cited *Williams* with approval.

The defendant Gilliam here contends that no scheme to defraud is shown because the "check-kiting" was only to pay mounting debts and creditors' claims, and that the distinct and definitely stated purpose, object, and intention were to take up, ultimately, and pay the "kited" checks. But as so aptly answered in Federman v. United States, supra, 36 F. 2d 441, at 442:

> "Appellant's plan, whereby he intended to get, and did get, money from one bank upon the representation of the check, which was a representation that there was money in the bank on which the check was drawn, when as a matter of fact there were no funds in the drawee bank, without any power in the drawer of the check to provide funds to pay such check, except by drawing a like check under like circumstances, constituted a scheme to defraud. This does not mean that every drawer of a check against an account where he has no funds is guilty of a scheme to defraud, but, when the undertaking is such that the checks must be drawn and passed in rapid succession from one bank to another in an endless chain, as here, a scheme to defraud is shown."

Now whether we call it "check-kiting", or whether we call it writing checks on insufficient funds and later covering them with other insufficient fund checks, what we call the dodge doesn't matter. Where there is no reasonable expectation that funds will be there when the checks are presented for payment, then the offense exists.

It is urged that Gilliam had a reasonable expectation that funds would be available to pay the out-of-state n. s. f. checks when presented for payment because he had no knowledge of the small size of the balances in the out-of-state banks upon which the relatively larger, in fact overwhelmingly larger, eight n. s. f. checks were drawn and signed by

Cohen and Florence Cohen, and filled in and deposited by Gilliam. The argument is that since these out-of-state accounts were in the names of the Cohens, Gilliam presumably had no way of knowing that they actually did not contain balances of funds anywhere approximating the amounts of the n. s. f. checks written upon them and deposited in the Atlantic-Pacific Leasing account in the Beverly Hills National Bank.

The short but effective answer to this line is that Gilliam was a member of the family before and during this "check-kiting" fling in May and June of 1963; that he was the son-in-law of the Cohens; and that, as testified by Ruth Lavine, his sister-in-law, and by Manuel Cohen himself, it was common knowledge in the family circle, openly and jocularly discussed at Christmas and other holiday gatherings of the Cohen clan, that the Cohen out-of-state accounts—certainly the Florence Cohen accounts—were nominal balance accounts of no more than two or three figure amounts. They were set up as small Christmas gifts or as "accounts of convenience" to be used on pleasure trips to the various states as occasion might warrant.

Whether they were set up as part and parcel of the "check-kiting" plan and scheme we need not decide at this juncture. Suffice it so say that certainly there is substantial evidence of Gilliam's knowledge of the dubious disparity between the out-of-state bank balances and the n. s. f. checks signed by the Cohens, filled in by Gilliam, and deposited to the Beverly Hills account of the auto leasing venture in which both Gilliam and Cohen were actively, almost desperately, involved in the crucial period of May-June 1963 when they both were staving off creditors.

Even though not shown by the direct testimony of the Cohens, father-in-law and sister-in-law, such guilty knowledge and wrongful intent might well be inferred from the large gap between balances and n. s. f. checks. For instance, we can tabulate the following out-of-state

check amounts and account balances on the dates the n. s. f. checks were filled in by Gilliam and deposited, along with the startling differentials between them:

| Date: 1963 | Bank | N.S.F. Check Amount | Balance in Account | Difference (Overdraft) |
|---|---|---|---|---|
| May 31 | Lincoln National Bank, Syracuse, N. Y. | $ 25,000.00 | $288.74 | $ -24,711.26 |
| May 27 | Citizens Bank & Trust Co., Covington, La. | $ 15,000.00 | $ 24.00 | $ -14,976.00 |
| 29 | same | 18,000.00 | — | -32,976.00 |
| 31 | same | 35,000.00 | — | -67,976.00 |
| May 27 | Gulf National Bank, Gulfport, Miss. | $ 15,000.00 | $ 29.72 | $ -14,970.28 |
| 29 | same | 18,000.00 | — | -32,970.28 |
| May 27 | Bank of Nevada Las Vegas, Nev. | $ 18,000.00 | $291.85 | $ -17,708.15 |
| May 29 | Citizens State Bank, Houston, Texas | $ 15,000.00 | $ 61.75 | $ -14,938.25 |
| Totals: | | $159,000.00 | $696.08 | $-158,303.94 |

The crucial credibility gap yawning between guilt and innocence stands out starkly from the mere sketching of this $158,303.94 differential between the checks and the balances, and in itself alone is evidence that must go to the jury.

Thus, the question before us is the same question before the court in *Williams* and in *Federman,* namely, whether the defendant had a reasonably certain belief that the funds would be available for payment of the checks. Whether Gilliam had such a belief is a question for the jury and not for this Court.

After analyzing the law, considering the evidence in the record here, and measuring both by study of the *Williams* case, including the transcript of the record therein, as well as of the *Federman* case, we are compelled to state that our view now is that we cannot in the present case grant Gilliam's motion for acquittal. We must and do decide that it is a question of fact upon which the jury is entitled to pass in determining Gilliam's guilt or innocence.

The motion for judgment of acquittal is denied, a mistrial is declared, and the matter is ordered set upon the calendar for a new trial.

Dated: July 21, 1967, but effective *nunc pro tunc* as of November 1, 1966.